# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40039**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Jonel H. GUIHAMA**
Master Sergeant (E-7), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 18 November 2022

————————————

*Military Judge:* Jennifer E. Powell (motions); Colin P. Eichenberger.

*Sentence:* Sentence adjudged on 19 November 2020 by GCM convened at Joint Base Lewis-McChord, Washington. Sentence entered by military judge on 22 January 2021: Dishonorable discharge, confinement for 10 years, forfeiture of all pay and allowances, and reduction to E-1.

*For Appellant:* Lieutenant Colonel Kirk W. Albertson, USAF; Catherine M. Cherkasky, Esquire.

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Major Cortland T. Bobczynski, USAF; Major John P. Patera, USAF; Mary Ellen Payne, Esquire.

Before POSCH, RICHARDSON, and CADOTTE, *Appellate Military Judges*.

Senior Judge POSCH delivered the opinion of the court, in which Judge RICHARDSON and Judge CADOTTE joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

POSCH, Senior Judge:

A general court-martial composed of a military judge sitting alone convicted Appellant, contrary to his pleas, of possessing, viewing, and distributing child pornography, in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934, *Manual for Courts-Martial, United States* (2012 ed.) (2012 *MCM*). The military judge also convicted Appellant, contrary to his pleas, of aggravated sexual abuse of his nephew on divers occasions, and aggravated sexual contact upon his niece in violation of Article 120, UCMJ, 10 U.S.C. § 920, *Manual for Courts-Martial, United States* (2008 ed.) (2008 *MCM*).[1,2] The adjudged and approved sentence consisted of a dishonorable discharge, confinement for ten years, forfeiture of all pay and allowances, and reduction to the grade of E-1.

Appellant raises five assignments of error: (1) whether the military judge abused her discretion in denying Appellant's motion to suppress the search and seizure of digital devices[3] from his home; (2) whether the military judge abused her discretion in denying Appellant's motion to suppress statements he made to law enforcement because they were not shown to be sufficiently corroborated; (3) whether the military judge abused her discretion in denying Appellant's motion for appointment of a polygraph expert; (4) whether the evidence is legally and factually sufficient to sustain Appellant's convictions for aggravated sexual abuse of his nephew and aggravated sexual contact with his niece; and (5) whether trial counsel committed prosecutorial misconduct during closing argument. In addition to these issues, the court considers whether Appellant was denied a right to timely appellate review. The court has evaluated Appellant's arguments in support of assignment of error (3) and finds neither discussion nor relief warranted. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

---

[1] Except where indicated, references to the UCMJ, Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2019 ed.) (2019 *MCM*).

[2] Appellant was convicted of two Article 120, UCMJ, specifications alleged under separate charges that spanned "between on or about 28 January 2011 and 27 June 2012." Consistent with his pleas, Appellant was found not guilty of one specification each of sexual abuse of a child, his nephew and niece, "between 28 June 2012 and on or about 27 August 2013," which were charged in the alternative as violations of Article 120b, UCMJ, 10 U.S.C. § 920b (2012 *MCM*).

[3] In this opinion, we use "digital devices" to include computers, smartphones, mobile equipment that shares properties and capabilities of computers and smartphones, and storage media for such devices.

We conclude that the search and seizure of digital devices from Appellant's home was lawful. We also conclude that Appellant's admissions to fondling his nephew and niece were corroborated, and that the two convictions founded on those admissions are legally and factually sufficient. We conclude, moreover, that trial counsel did not commit prosecutorial misconduct during closing argument. Lastly, we find that Appellant has not shown prejudice during appellate review. Finding no error materially prejudicial to a substantial right of Appellant, we affirm the findings and sentence.

## I. BACKGROUND

Appellant and his wife lived by themselves in a single-family residence in Spanaway, Washington. Their home was near Joint Base Lewis-McChord, Washington, where Appellant worked. In May 2017, special agents of the Federal Bureau of Investigation (FBI) suspected Appellant used a group chat feature in a smartphone application to share links to child pornography with other members of the group. Each link allowed a member to access pictures and videos in Dropbox, a cloud-based file storage service accessible via the Internet.

In August 2018, an FBI agent obtained a search warrant for Appellant's home from a United States magistrate judge. The agent suspected he would find evidence that Appellant possessed, viewed, and distributed child pornography. In September 2018, the FBI executed the warrant and seized several digital devices belonging to Appellant. Forensic analysis of those devices confirmed the agent's suspicion. Over 10,000 sexually explicit pictures and videos of children matched files of child pornography on record in a digital catalogue maintained by the National Center for Missing and Exploited Children (NCMEC). Subsequent investigation by special agents of the Air Force Office of Special Investigations (AFOSI) would reveal that Appellant kept about 200 pictures and 400 videos of child pornography in a Dropbox account he used to exchange links with members of various messaging groups.

At the same time investigators collected evidence from the residence, Appellant was interviewed by the FBI agent who obtained the warrant and a second agent. Appellant admitted he possessed, viewed, and distributed child pornography using his smartphone, a laptop computer, and files saved in Dropbox accounts. At the conclusion of the interview, Appellant agreed to take a polygraph. The polygraph was administered the same day at an AFOSI detachment on Joint Base Lewis-McChord, Washington. The FBI agent who administered the polygraph did not participate in the earlier interview with Appellant or the search of his home.

During the post-polygraph interview, Appellant admitted that he touched his nephew and niece in a sexual manner. Appellant said this occurred as his nephew and niece slept on the living room floor when Appellant and his wife

visited with his wife's family in the 2011 to 2012 timeframe. Appellant stated that his nephew was about 12 or 13 years old at the time, and his niece was two years younger than the nephew. Appellant also admitted he touched his nephew in the same way on a subsequent visit with his wife's family sometime in summer of 2011 or 2012, before the children returned to school. At trial, the Prosecution introduced Appellant's admissions and testimony from members of his wife's family as evidence that Appellant abused his nephew and niece.

## II. DISCUSSION

### A. Search of Appellant's Digital Devices

Before trial, Appellant moved to suppress evidence found on digital devices seized from his home. The military judge denied the motion, ruling that the evidence was admissible. At trial, the Government relied on that evidence to prove that Appellant committed seven child pornography offenses in violation of Article 134, UCMJ (2012 *MCM*). Appellant challenges that ruling.

#### 1. Additional Background

In April and May 2017, Appellant was an active member of various groups that used an application called Kik. According to the record, Kik can only operate from a smartphone or other mobile device. During the relevant period, several members identified by their Kik usernames would share files or links to child pornography. One member, who investigators later determined was Appellant, used Kik's messaging feature to share links to three pictures depicting child pornography that were saved to a Dropbox account.

As part of its investigation, the FBI subpoenaed Kik and learned the Internet Protocol (IP) address associated with the Kik user who sent links to other members of a group. The FBI determined the IP address had been assigned by an Internet service provider to a residence in Spanaway, Washington. Further investigation revealed Appellant lived with his wife at that residence.

##### a. Search Warrant Application

In time, an FBI agent sought a warrant to search and seize items he believed would be found on Appellant's person or in his home. The agent completed an affidavit in support of the warrant application. Before presenting the affidavit to a magistrate judge, the agent consulted with colleagues who investigated child exploitation crimes, with computer forensic experts, and with the Office of the United States Attorney. The agent swore to and signed his application and its attached affidavit in the presence of the magistrate judge.

The FBI agent stated that his "investigation involve[d] the use of the Kik messenger service." He explained that "Kik is a smartphone messenger application based in Ontario, Canada." He also explained Kik "is well known to law

enforcement and commonly used for child exploitation." He further explained that Kik "uses an existing wireless connection or data plan to communicate with other users." He stated that FBI agents had been monitoring communications within a Kik messaging group "and saw numerous discussions related to the sexual exploitation of children and the sharing of child pornography."

Importantly, the agent related in his affidavit that he was aware of "numerous instances in which members of the group chat posted child pornography and/or links to child pornography to share with other members." The affidavit identified a Kik user who "shared child pornography files through the group chat, including three files of suspected child pornography." The FBI agent stated he had "reviewed each of these files" and then described them in his affidavit. The agent explained that "[i]n response to a subpoena seeking subscriber information and IP connection logs . . . , Kik reported that this user accessed the Kik service from" the IP address assigned by Appellant's Internet service provider to Appellant's residence. The subscriber information included an email address. Through investigation, the FBI agent discovered that the same email address was associated with a social media account that appeared to belong to Appellant. The agent stated a belief "that computers and other digital devices containing evidence of child pornography [would] be located" at Appellant's home.

The agent explained "that cellular mobile phones (often referred to as 'smart phones') have the capability to access the Internet and store information, such as images and videos." Individuals using a smartphone, the agent noted, can "also easily connect the device to a computer or other digital device" and transfer files. The affidavit explained that digital devices often access the Internet through wireless networks typical in many homes.[4] It also illustrated how files can be transferred between devices:

> Based on my training and experience and information provided to me by computer forensic agents, I know that data can quickly and easily be transferred from one digital device to another digital device. Data can be transferred from computers or other digital devices to internal and/or external hard drives, tablets, mobile phones, and other mobile devices via a USB [Universal Serial Bus] cable or other wired connection. Data can also be transferred between computers and digital devices by copying data to

---

[4] The affidavit stated, "Based on my training and experience, today many residential Internet customers use a wireless router to create a computer network within their homes where users can simultaneously access the Internet (with the same public IP address) with multiple digital devices."

small, portable data storage devices including USB (often referred to as "thumb") drives, memory cards[,] . . . memory card readers, and optical discs (CDs/DVDs).

The affidavit described the capacity of digital storage devices as repositories for child pornography:

Based on my training and experience, I have learned that the computer's ability to store images and videos in digital form makes the computer itself an ideal repository for child pornography. The size of hard drives used in computers (and other digital devices) has grown tremendously within the last several years. . . . These drives can store thousands of images and videos at very high resolution.

The affidavit included a description of conduct that the affiant understood is typical of collectors and distributors of child pornography:

Based on my training and experience, collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by companies such as Google, Yahoo, Apple, and Dropbox, among others. . . . A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

The FBI agent also described known "characteristics common to individuals who have a sexualized interest in children and depictions of children." As he related in the affidavit, these characteristics include: (1) "[t]hey may collect sexually explicit or suggestive materials in a variety of media;" (2) their "collections are often maintained for several years and are kept close by, often at the individual's residence or some otherwise easily accessible location, to enable the owner to view the collection, which is valued highly;" and (3) "[t]hey also may correspond with and/or meet others to share information and materials." The FBI agent averred that a member of the Kik group chat under investigation, such as Appellant, "likely has a sexualized interest in children and depictions of children and that evidence of child pornography is likely to be found on digital media devices, including mobile and/or portable digital devices" located in Appellant's home or on his person.

### b. Evidence Obtained from the Search

In reliance on the warrant, FBI agents accompanied by at least one AFOSI agent seized items in Appellant's residence. Forensic analysis of those items found child pornography on four devices: a smartphone, a media card inside

6

the phone, an Asus-brand laptop computer, and a Seagate-brand external hard drive. The laptop stored most of the contraband. It contained 6,798 pictures and 5,000 videos with hash values matching files of child pornography on record in a NCMEC database.[5] The Seagate external hard drive was the only external drive seized from the residence.

Forensic analysis of these four devices revealed 11,885 files of child pornography—6,821 pictures and 5,064 videos—that matched NCMEC hash values.[6] Of these files, 5,368 had unique hash values that were not duplicates of other pictures and videos found on Appellant's devices. Appellant's possession of child pornography in online storage was not shown to be tied to a specific device seized from his person or home: each of the four devices contained files with links to Dropbox and other file sharing services.[7]

### c. Investigation during and after the Search

As other agents collected evidence, and before that evidence was forensically analyzed, two FBI agents sat Appellant in the front passenger seat of a sedan that was parked outside his home. After rights advisement and waiver of rights, the agents began to question Appellant. We summarize Appellant's answers to those questions in some detail to evaluate the Government's claim that evidence seized from his home would have been discovered even if the scope of the warrant was unlawful because probable cause was lacking.

Appellant admitted he used his Asus laptop computer to view pornography, usually of "men and women," but a link would "pop[ ] up every now and then" of someone who would "look younger." As an example, Appellant described how a website might indicate that a person was 18 years old, "but they

---

[5] The court understands that, in this context, a matching hash value indicates a file that was previously identified as a copy of a known image of child pornography.

[6] As found by the military judge, the phone and its memory card contained 23 pictures and 60 videos depicting child pornography, but none with hash values matching the NCMEC database; and the external hard drive contained "[f]our videos along with a Zip archive containing files that appeared to depict child pornography in a PDF [portable document file] format." Analysis showed the Zip archive was named "16E7 Study Guide.pdf" and contained 49 video files which, in the opinion of an analyst, "appeared to depict potential child pornography." The analyst concluded that "[t]he archive was likely copied to the External HD [hard drive] on or about 9/18/2017 03:47:00 as part of a mass copy of folders and files which appeared to include family photos and work related documents."

[7] Two spreadsheet files found on the external hard drive contained uniform resource locator links to Dropbox and other file-sharing services. A text file on the same hard drive contained login and password information for these and other user accounts under headings, "BOY," "GIRL," "RANDOM," and "SORT."

look younger, like 14, [or] 15." The laptop was the same device he used "for finances and researching for work" and he protected it with a password. Importantly, Appellant kept the password together with other passwords in a spreadsheet he saved on a network hard drive. Appellant told the agents he had two wireless networks in his home, each with its own router. One network included a hard drive connected to a router. When asked whether he could access this router "from anywhere anytime," Appellant responded that he could.

Appellant described to the FBI agents how he used Kik to share links with other members. In Appellant's telling, each link allowed access to images of children that someone else had saved in a Dropbox file. Appellant acknowledged those links pointed to "sexually explicit images" of children under the age of 18. He admitted forwarding those links to other members:

> **Q** [FBI agent]: Have you ever sent a drop box link over Kik to share files?
>
> **A** [Appellant]: Drop box, yes.
>
> **Q**: You have, okay.
>
> **A**: I did.
>
> **Q**: And what type of files were in there?
>
> **A**: It was bad stuff.
>
> **Q**: What type of bad stuff?
>
> **A**: It was, whatchamacallit, some younger folks.
>
> **Q**: How young?
>
> **A**: Like in their teens.

Appellant further described how someone in a Kik messaging group would send him a link to pictures of boys and girls. Appellant described the photos as "just kids like in shorts or whatever." However, he continued: "I mean, [the] bad part is some of them were nude." He acknowledged using his smartphone to access a link in a Kik message, and then forwarding that link so he could access it later on his laptop:

> **Q** [FBI agent]: Okay. Did you--when you clicked on the link, did you download those photos to your computer?
>
> **A** [Appellant]: No.
>
> **Q**: No, *you just had the link?*
>
> **A**: Yes.
>
> **Q**: Okay. *And was this on your Asus computer?*

A: *Yes.*

Q: Okay. And so you did Kik from your Asus, or did you send the link----

A: No, Kik is only on my phone.

Q: Okay, so that's what I'm trying to understand. So did you-- this link, *did you send it using your phone?*

A: *Yes.*

Q: Okay.

A: Like the link, yes, I used my phone for that one.

(Emphasis added).

Appellant estimated a typical link would reference about "30 or 40" files. Among the files Appellant told the FBI agents he saw, there were images of young boys and girls who were nude. In Appellant's telling, the ages of the children were "young teens, it's under age, I know that for sure." Some of the children, according to Appellant, were ages 12 to 13. When asked whether these children "were engaged in sex acts," Appellant responded in the affirmative. However, he maintained that such acts were "[n]ot with other people." After these disclosures, the FBI agent asked Appellant if he would be willing to let them take over his Kik accounts. They advised him of his "right to refuse to allow the FBI to assume [his] online identity," after which Appellant, in writing, authorized the FBI "to assume and use" his online identity. The authorization allowed the FBI to access Appellant's Kik account.

The FBI agent asked Appellant, "How many times would you say you sent a link on Kik that linked back to photos or videos of children either nude or engaged in sex acts?" In time, Appellant replied that between sending his first link in February 2016 through the spring of 2018, he shared child pornography within various Kik messaging groups about 30 to 40 times. The FBI agent challenged Appellant with "minimizing" his involvement, which prompted Appellant to disclose that he distributed at least ten different links on any given month. Towards the end of the interview, Appellant acknowledged he "didn't really stop" even after "it got to a point of where [his] wife was telling [him] [to] just get rid of this account and everything." The FBI agent suggested, "So it hasn't stopped." Appellant replied, "Right."[8]

---

[8] During the post-polygraph interview with the FBI on the same day the search was conducted, Appellant admitted that his wife had found links to "underage" pornography on his computer and told him to "get rid of it." Appellant said he "did to a point, but then [he] never deleted everything."

Several times during the interview, the FBI agent communicated with the search team. According to an FBI report attached to Appellant's pretrial motion, the agent told the search team to look for an Asus laptop and cell phone. According to that report, moreover, an AFOSI agent who participated in the search of the home "was able to identify sexually explicit files of possible minors on the hard drive of the A[sus] laptop." As discussed above, the laptop and smartphone were seized along with a media card inside the phone and one external hard drive.

The day after the search, the FBI transferred the evidence it collected to the AFOSI, which took the lead in the investigation. AFOSI agents sent evidence obtained from Appellant's home for forensic analysis while pursuing other leads. Those leads included obtaining evidence of files saved in Appellant's Dropbox account, as well as his activities and contact with the file storage service.

### d. Suppression Hearing

Before trial, the military judge held an Article 39(a), UCMJ, 10 U.S.C. § 839(a), hearing to rule on the suppression motion. In Appellant's brief filed before that hearing, he sought to suppress evidence derived from the search of his home on two grounds. First, he claimed that probable cause was stale due to the passage of time. On appeal, Appellant does not renew a staleness claim; nonetheless, we considered it and find relief is not warranted on that basis. Second, he argued that even if there was probable cause to generally support a search warrant, there was no probable cause to search and seize any device that was not a Kik-capable mobile device. Appellant reasoned that Kik was a smartphone application, and there was no evidence to believe that he had possessed, viewed, or distributed child pornography using a non-Kik-enabled device such as those found by the FBI when agents searched his home.

In a written opposition to the motion, the Government argued the evidence should not be suppressed because there was a sufficient particularized nexus linking Appellant's use of the Kik application on his phone to digital devices found in his home. In addition to arguing that the FBI had probable cause, the Government argued that FBI agents acted in good faith and that future deterrence would not outweigh the costs to the justice system from suppression. At the hearing to decide the matter, the Government argued, moreover, that the inevitable discovery doctrine would permit admission of the evidence.

The FBI agent who prepared and signed the affidavit testified at the hearing. The genesis of his investigation was a lead he received after Appellant used Kik to share links to child pornography kept in a Dropbox file. The agent explained how Dropbox can be accessed from both computers and cell phones. He described how someone could click on and follow a link to files stored in a

Dropbox account and would "see whatever was stored in that Dropbox account, whatever that link goes back to." The FBI agent described Kik as a messaging application used on mobile devices like cell phones.[9]

The FBI agent explained his thought process in obtaining a warrant to search Appellant's home. Trial counsel asked why the agent sought "to search all of [Appellant]'s digital devices, given that [the FBI agent] had information about [Appellant's] Kik conversations" from an application that resided on Appellant's smartphone. The agent answered that there were

> [a] couple of reasons, one of which is it's very easy to transfer files or images from one device to another, and in the experience that [he] had to that point, as well as discussions with other agents and task force officers, it was clear that in many cases these individuals who collected these types of images and videos did keep them on multiple devices and multiple storage systems. That would be reason one. Reason two is that in the lead that [the agents] got, the sharing in the Kik group was done with Dropbox links, and Dropbox applications that could be used both on a cellphone as well as any digital device, including a computer, desktop computer, laptop, tablet, *et cetera*.

The agent also explained why he included digital storage devices such as external hard drives in the search warrant application. In the agent's telling, "we had, at the time, frequently seen if you're viewing, or downloading, or sharing child pornography images on a computer or a phone, that you would store those images and files on external storage devices like an external hard drive, or a USB drive, or things of that nature."

### e. Ruling

The military judge denied the motion. She disagreed with Appellant's contention that there was an insufficient particularized nexus linking Appellant's use of the Kik application on his phone to the Asus laptop and Seagate external hard drive. She concluded that the magistrate judge had a substantial basis to find probable cause to search Appellant's digital devices beyond his Kik-capable smartphone.

The military judge found the magistrate judge "could have reasonably inferred from the evidence presented to him that if [Appellant] sent child pornography through Kik, he likely could have obtained such material from the digital devices within his possession, including his laptop or external hard drives." She found it was reasonable to infer, moreover, that "Kik was merely

---

[9] Trial counsel asked the FBI agent, "Can you use the Kik application on a computer?" The agent replied, "I don't believe so."

the medium by which [Appellant] accomplished his distribution of child pornography." She also noted evidence presented in the affidavit indicated that the images Appellant shared "must be stored at another location," and that the magistrate judge could reasonably infer that this could be "a secure and private location such as his residence." The military judge also found that Appellant's active participation in a Kik messaging group "reflect[ed] at the very least an ongoing interest in child pornography." The military judge concluded that the magistrate judge had a substantial basis for finding probable cause to search Appellant's home.

The military judge also determined that even if she had found the search warrant was not supported by probable cause, the evidence was admissible under the good-faith exception to the exclusionary rule:

> Prior to submitting his search warrant application, [the FBI agent] sought guidance from FBI colleagues with relevant experience and the United States Attorney . . . . The information included in the affidavit was neither false nor reckless. Although the Magistrate Judge did not ask [the FBI agent] any follow up questions after his review of the application, there is no evidence he "rubber stamped" the approval for a search warrant nor abandoned his judicial role. Further, the warrant was not so facially deficient that [the FBI agent] and others executing the search warrant could not reasonably presume it to be valid. The search team received specific guidance of the restrictions of the search warrant and had access to copies of the actual document prior to executing the search. As law enforcement executed the search warrant, they spoke with [the FBI agent] throughout and only seized the evidence authorized. Finally, the Magistrate Judge had a substantial basis for finding probable cause, and it was not unreasonable for law enforcement to rely upon it.

The military judge also determined that the evidence would be admissible under the inevitable-discovery doctrine. She found that "Government agents possessed and were actively pursuing evidence and leads that would have inevitably led to the discovery of the evidence" at issue. In particular, she found that Appellant made statements to the FBI about the use of his laptop to access child pornography at the same time as the search team collected evidence from

the home.[10] Among those statements, Appellant "spoke to them about his most frequently used devices," namely, his phone and laptop computer.

### f. Evidence Admitted at Trial

At trial, the Prosecution presented evidence from forensic analysis of Appellant's phone and the media card inside the phone, his laptop computer, and his external hard drive. The trier of fact was informed that 6,821 pictures and 5,064 videos contained unique identifiers linked to a list of known child pornography files on record in a NCMEC database. Most contraband was stored on the laptop as described above. The Prosecution introduced 6 pictures from Appellant's phone, 6 videos from the media card inside the phone, 6 pictures and 22 videos from his laptop, and 2 videos from his external hard drive.

Although not challenged by Appellant on appeal, in the findings portion of the court-martial, the Prosecution introduced evidence of files discovered in Appellant's Dropbox account. A subpoena confirmed a Dropbox account was associated with Appellant's email address. As described earlier in this opinion, a subsequent search warrant uncovered about 200 pictures and 400 videos of child pornography Appellant kept online with the file storage service. A number of images appeared to depict children under the age of ten being anally penetrated by a penis or showed a penis resting on a child's vagina. Evidence showed that Appellant maintained these images and other material in folders with the names, "sex boy," "chubby punhetas," "XXX boy," "kid sex," and "kid sex by man." At trial, the Prosecution introduced two pictures and one video that it considered to be representative of images obtained from Dropbox.

### 2. Law

A military judge's ruling on a motion to suppress evidence is reviewed for an abuse of discretion, "viewing the evidence in the light most favorable to the party prevailing below." *United States v. Hoffmann*, 75 M.J. 120, 124 (C.A.A.F. 2016) (citation omitted). The military judge's findings of fact are reviewed for clear error while conclusions of law are reviewed de novo. *Id.* (citation omitted). An abuse of discretion occurs when the military judge's findings of fact are clearly erroneous, or she misapprehends the law. *See United States v. Clayton*, 68 M.J. 419, 423 (C.A.A.F. 2010) (citation omitted).

A magistrate's probable cause determination is not reviewed de novo. *Hoffmann*, 75 M.J. at 125. Instead, the court's focus is whether a "magistrate had a substantial basis for concluding that probable cause existed." *United States*

---

[10] The military judge also found that exclusion of the evidence would not result in appreciable deterrence of future unlawful searches or seizures and that the benefits of deterrence did not outweigh the costs to the justice system. Mil. R. Evid. 311(a)(3). We find it unnecessary to examine this aspect of the ruling below.

*v. Nieto*, 76 M.J. 101, 105 (C.A.A.F. 2017) (quoting *United States v. Rogers*, 67 M.J. 162, 164–65 (C.A.A.F. 2009)). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Great deference is given to the magistrate's probable cause determination due to the Fourth Amendment's[11] strong preference for searches conducted pursuant to a warrant. *Id.* at 236 (citations omitted). This standard also "reflects the law's preference for . . . independent review by magistrates." *United States v. Macomber*, 67 M.J. 214, 218 (C.A.A.F. 2009).

However, a reviewing court's deference is "not boundless," as the United States Supreme Court observed in *United States v. Leon*, 468 U.S. 897, 914 (1984). Our probable cause analysis focuses on "the evidence as set out in the four corners of the requesting affidavit . . . illuminat[ed] by factors such as the veracity, reliability, and basis of knowledge of the individual presenting the evidence." *United States v. Leedy*, 65 M.J. 208, 214 (C.A.A.F. 2007) (alteration in original) (internal quotation marks and citations omitted). "[C]ourts should not invalidate warrants by interpreting affidavits in a hyper-technical, rather than a commonsense, manner." *United States v. Gallo*, 55 M.J. 418, 421 (C.A.A.F. 2001) (quoting *Gates*, 462 U.S. at 236).

### 3. Analysis

Appellant renews the claim he first raised in a pretrial motion that there was insufficient probable cause for the FBI to search and seize digital devices in his home where contraband was discovered. Appellant contends that the FBI agent's affidavit "failed to present a substantial basis for the magistrate to find probable cause to search and seize any non[-]Kik-capable or Dropbox[-]linked electronic devices" for evidence of child pornography. To the extent Appellant's assignment of error may be understood to challenge evidence obtained from his smartphone and the media card inside the phone, we find the military judge did not abuse her discretion in ruling that evidence was admissible.

Our focus, like Appellant's brief, is on the evidence found on Appellant's Asus laptop and Seagate external hard drive. Appellant makes the point that an FBI agent obtained a warrant "despite having a singular piece of digital evidence in his possession – a Kik message exchange with a Dropbox link." On appeal, the Government argues that the search should be upheld because Appellant fit a profile described by the FBI agent in his affidavit. The Government argues, also, that it was common sense and reasonable for the magistrate judge

---

[11] U.S. CONST. amend. IV.

to infer that somebody who exchanged links to child pornography using a mobile messaging application, such as a smartphone, would store child pornography on other devices at a secure and private location.

### a. Probable Cause

We agree such an inference is reasonable here and find that the FBI agent's affidavit provided a substantial basis for the magistrate judge to find probable cause. As counsel for both sides acknowledge, a central issue is the requirement that a particularized nexus link Appellant's misconduct involving a Kik-capable mobile device—his smartphone—and Dropbox to devices in his home where substantially more contraband was discovered. The military judge recognized this as well. Citing *Nieto*, 76 M.J. at 106–07, *Clayton*, 68 M.J. at 424, and *Macomber*, 67 M.J. at 220–21, the military judge was satisfied the affidavit demonstrated the required nexus, as are we. In that regard, we find the military judge did not misapprehend the applicable law when evidence found on one digital device is the basis for a search warrant for another.

A nexus inquiry "focuses on whether there was a fair probability that contraband or evidence of a crime will be found in a particular place." *Nieto*, 76 M.J. at 106 (internal quotation marks and citation omitted). "A nexus may be inferred from the facts and circumstances of a particular case, including the type of crime, the nature of the items sought, and reasonable inferences about where evidence is likely to be kept." *Id.* (internal quotation marks and citation omitted). When evaluating whether a nexus is shown because an appellant fits the description of a valid experience-based profile, a "'profile alone without specific nexus to the person concerned cannot provide the sort of articulable facts necessary to find probable cause to search' or seize." *Id.* at 106 (quoting *Macomber*, 67 M.J. at 220).

In *Nieto*, the appellant was suspected of using a camera on his cell phone to surreptitiously record soldiers using the latrine. 76 M.J. at 103. Investigators learned the appellant possessed a laptop but had no "direct evidence" those recordings would be transferable to the laptop or found on that device. *Id.* at 103–04. In securing authorization to search the laptop, an investigator informed the magistrate that Soldiers "normally download[ ]" or back up photos from their cell phones "to their laptops," to post on the Internet. *Id.* at 104. The United States Court of Appeals for the Armed Forces (CAAF) found the Government's affidavit was insufficient to establish a nexus to search the appellant's laptop; it noted that the affiant's "generalized profile about how servicemembers 'normally' store images was technologically outdated and was of little value in making a probable cause determination." *Id.* at 107. The CAAF further noted in *Nieto* that no information was provided to the magistrate that the appellant owned a device other than his cell phone, that there had been data transfers of any kind from his phone to another device, or that he had used

another device to store or transmit data. *Id.* Accordingly, there was insufficient nexus to lawfully search the appellant's laptop. *Id.*

The appellant in *Clayton* was a subscriber to an Internet group formed to discuss, share, and distribute child pornography. 68 M.J. at 421. Investigators learned the appellant accessed the site using a Government laptop and an email account bearing his name. *Id.* at 422. The information provided to the magistrate gave no indication that the appellant had "accessed the site from his quarters or that he owned a personal computer." *Id.* at 423. After contraband was discovered on his personal laptop and other digital media seized from his dorm room, the appellant asserted a lack of probable cause for the search. *Id.* at 421. Surveying a number of federal appellate cases, the CAAF noted those cases "reflect[ed] a practical, commonsense understanding of the relationship between the active steps that a person might take in obtaining child pornography from a website and retaining it for an extended period of time on that person's computer." *Id.* at 424. The CAAF similarly embraced observations made by a number of courts that "a person's voluntary participation in a website group that had as its purpose the sharing of child pornography supported a probable cause determination that child pornography would be found on the person's computer." *Id.*

In *Macomber*, the appellant was a known subscriber to a child pornography website. 67 M.J. at 215. Investigators learned the website identified the appellant by his name, dorm address, and telephone number. *Id.* at 215–16. Investigators also learned from a postal inspector that the appellant had ordered child pornography videos for delivery to that address. *Id.* at 216. An investigator completed an affidavit to support a search authorization for the appellant's dorm room to look for evidence of child pornography. *Id.* at 216–17. The affidavit included profile information provided by an investigator that was based on guidance received from other investigators, and "profile information relating to individuals who view child pornography and who have a sexual interest in children" that was provided by the postal inspector. *Id.* at 216. The profile was also based on the investigator's training "during which 'typical behavior of child pornographers' was described." *Id.* at 217. The affidavit explained that "persons with a sexual attraction to children almost always maintain and possess child pornography materials" that "are stored in a secure but accessible location within their immediate control, such as in the privacy and security of their own homes, most often in their personal bedrooms." *Id.* at 217. A magistrate authorized a search of the appellant's dorm room where investigators found "several hundred suspected child pornography images retrieved from his computer." *Id.* at 218.

Among the *Macomber*-appellant's arguments challenging the magistrate's finding of probable cause was that the profile provided insufficient nexus to

search the appellant's dorm room, much less the computer that was discovered in his dorm room. *Id.* at 219. The appellant also complained the affidavit "did not expressly conclude or state that [the a]ppellant fit the [investigator's] profile." *Id.* at 220. The CAAF concluded that the military judge did not err in ruling that the magistrate had a substantial basis for finding probable cause. *Id.* at 221. Without reaching the question whether the appellant fit the profile, the CAAF found the military judge did not err in denying the motion to suppress:

> Based on common sense, law enforcement experience, and case law, the military judge reasonably concluded there was a fair probability that a person with an interest in child pornography, who has ordered child pornography in the past and in the present, is likely to store such pornography in some quantity at a secure and private location. For a servicemember residing on a military installation, that means his dormitory room, barracks, or vehicle.
>
> . . . Once [investigators] had probable cause to search the dorm room, agents were also authorized to search where the items sought might reasonably be located, and therefore the computer was within the scope of the search authorization. In any event, [the magistrate] reasonably relied on the common sense inference that a military member who subscribed to an Internet website while listing his dormitory as his address owned a computer, and that the computer would likely be found in his dormitory room.

*Id.* at 220.

In the case under review, the magistrate judge knew Appellant had either posted or received child pornography or links to child pornography to share. The magistrate judge was also aware Appellant facilitated that exchange by using an IP address where he lived. The magistrate judge knew these things because the FBI agent correctly stated them in his affidavit. Unlike *Nieto*, the magistrate judge knew the evidence at issue was readily transferable over the Internet and that Appellant could access the Internet using a wireless connection inside his home. Also, unlike *Nieto*, the magistrate judge could reasonably infer that more than one device was used to transfer contraband. In that regard, the magistrate judge knew that collectors and distributors of child pornography use online services to exchange child pornography. The magistrate judge could similarly infer Appellant used other devices to access child pornography in the same way that Appellant used his smartphone to send links that referenced contraband he kept in a location other than his smartphone.

As in *Clayton*, Appellant's participation in a group that exchanged contraband supported a probable cause determination that contraband would be found on other devices. *See* 68 M.J. at 424. As in *Macomber*, there was a fair probability Appellant would avail himself of the security and privacy of his home to store the contraband he exchanged. We agree with the military judge's determination that Appellant's phone was a medium by which Appellant distributed child pornography he kept in secure locations such as his home. Making reasonable inferences about where child pornography was likely to be kept, there was a fair probability that contraband would be found at the address associated with Appellant's IP address. Accordingly, the magistrate judge had a substantial basis for concluding that evidence and instrumentalities of child pornography would be found on digital devices located where Appellant lived.

Additionally, Appellant's conduct fit the experience-based profile in the requesting affidavit. *See Nieto*, 76 M.J. at 106 (observing, "law enforcement officer's professional experience may be useful in establishing . . . nexus"). The affidavit allowed the magistrate judge to connect Appellant's activities in the Kik group chat to the conduct of someone who would collect child pornography. Finding probable cause "merely requires that a person of reasonable caution could believe that the search may reveal evidence of a crime; *it does not demand any showing that such a belief be correct or more likely true than false*." *United States v. Hernandez*, 81 M.J. 432, 438 (C.A.A.F. 2021) (internal quotation marks and citation omitted). Here, the FBI agent explained that individuals interested in child pornography often conceal such materials on computers and other digital devices where they live. The affidavit also explained that, given the ease of transferring files, there was a reasonable probability that child pornography would be found on devices in Appellant's home. The magistrate judge had a substantial basis to conclude that, based on the FBI agent's professional experience and Appellant's conduct, a search of the digital devices in Appellant's home would yield evidence he accessed and stored child pornography using a computer or other digital device he kept in his home.

For these reasons, we are confident that the military judge did not err in finding that the magistrate judge had a substantial basis to find probable cause to search Appellant's digital devices beyond Kik-capable mobile devices. Thus, the military judge did not abuse her discretion in denying Appellant's motion to suppress the search and seizure of such devices, as claimed.

### b. Good-Faith Exception

As found by the military judge, the good-faith exception to the exclusionary rule applied in this case, even if probable cause were lacking. To reach this conclusion the military judge relied on Mil. R. Evid. 311(c)(3)(A)–(C). Under this rule, evidence obtained when a magistrate judge did not have a substantial basis to find probable cause may be admitted at trial if three requirements are

met. Subsections (A) through (C) of the rule, with case law interpreting the requirements of subsection (B), may be summarized—and restated—as follows:

> (A) The "search or seizure resulted from an authorization to search, seize or apprehend . . . from a search warrant or arrest warrant issued by competent civilian authority," Mil. R. Evid. 311(c)(3)(A);

> (B) "[L]aw enforcement official[s] had an objectively reasonable belief that the magistrate had a 'substantial basis' for determining the existence of probable cause." *United States v. Perkins*, 78 M.J. 381, 387 (C.A.A.F. 2019) (quoting *United States v. Carter*, 54 M.J. 414, 422 (C.A.A.F. 2001) (concluding the words "substantial basis" in Mil. R. Evid. 311(c)(3)(B) "examines the affidavit and search authorization through the eyes of a reasonable law enforcement official executing the search authorization")); and

> (C) "[T]he officials seeking and executing the authorization or warrant reasonably and with good faith relied on the issuance of the authorization or warrant. Good faith is to be determined using an objective standard." Mil. R. Evid. 311(c)(3)(C).

The Government argues on appeal that the good-faith exception to the exclusionary rule applies, and the evidence was not improperly admitted even if the magistrate judge's authorization lacked probable cause. We agree. There is no question that the first requirement of the exception is met: the magistrate judge had proper authority to authorize the search and seizure of digital devices from Appellant's home.

As to the second requirement, the military judge properly identified factors that showed the FBI agent who sought the search warrant had an objectively reasonable belief that the magistrate judge had a substantial basis for determining the existence of probable cause. Before seeking authorization to search, evidence shows the agent consulted with colleagues who investigated child exploitation crimes, with computer forensic experts, and with the Office of the United States Attorney. The agent neither intentionally nor recklessly misled the magistrate judge. *See Davis v. United States*, 564 U.S. 229, 238 (2011) (noting that exclusion of evidence is inappropriate "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence" (internal quotation marks and citations omitted)).

We reach this conclusion despite the fact that the FBI agent's affidavit articulated a belief that someone in Appellant's residence "*used a computer* or other digital media device to connect to and access a foreign chat service [Kik]."

19

(Emphasis added). This statement in paragraph 5 of the affidavit omits more detailed explanations in paragraphs 6 and 20, which explain that Kik is a messaging application for a *mobile* computing device such as a smartphone. We attribute this omission to simple, isolated negligence in preparing an 18-page affidavit comprising 43 paragraphs. Reading the three paragraphs together would not change law enforcement's objectively reasonable belief that the magistrate had a substantial basis to find probable cause.

Turning to the final requirement, we consider whether the FBI agent and other law enforcement personnel involved in the search and seizure of Appellant's digital devices "reasonably and with good faith relied on the issuance of the authorization." Mil. R. Evid. 311(c)(3)(C). We find that they did. The linkage in the affidavit between Appellant's use of the Kik messaging feature on his cell phone and digital storage devices in his home was "more than a 'bare bones' recital of conclusions." *Carter*, 54 M.J. at 421. We find the affidavit was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923 (internal quotation marks and citation omitted). It particularized both the place to be searched—Appellant's person and home—and, as stated in the affidavit, the types of items for which "seizure and forensic examination" was sought.

Overall, the magistrate judge's authorization in reliance on the affidavit was not "so facially deficient" that the executing officers could not "reasonably presume it to be valid." *Id.* (citation omitted); *see also Perkins*, 78 M.J. at 389 ("[T]he search authorization was not facially defective because it identified the place to search . . . and described in detail what to look for."). To this end, the good-faith exception recognizes that the exclusionary rule "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." *Leon*, 468 U.S. at 918–19. Accordingly, assuming probable cause was lacking, we would find the requirements of the good-faith exception to the exclusionary rule, Mil. R. Evid. 311(c)(3), were met, and evidence derived from the search of Appellant's home was properly admitted.

### c. Inevitable Discovery Exception

The military judge did not abuse her discretion in finding the inevitable discovery doctrine would apply in this case, even if probable cause were lacking. This exception to the exclusionary rule states "[e]vidence that was obtained as a result of an unlawful search or seizure may be used when the evidence would have been obtained even if such unlawful search or seizure had not been made." Mil. R. Evid. 311(c)(2). To prevail, "the Government must prove by a preponderance of the evidence that at the time of the unlawful search, government agents were already taking actions or pursuing leads such that their simultaneous actions and investigations would have inevitably led to the discovery of the evidence even absent [ ] unlawful conduct." *United States*

*v. Black*, ___ M.J. ___, No. 22-0066, 2022 CAAF LEXIS 614, at *15 (C.A.A.F. 25 Aug. 2022) (citation omitted).

The military judge concluded that even if the search was unlawfully over-broad in its scope, the Government would have inevitably discovered child pornography on digital storage devices that were seized from Appellant's home. That conclusion reached the laptop computer where most contraband in the residence was discovered. It also reached the external hard drive that was seized. Importantly, as found by the military judge, even as the FBI collected evidence from the residence, Appellant disclosed which devices he used most frequently, and that information was communicated to the search team. Evidence showed one of those devices was his smartphone. The other was his laptop, which contained 6,798 pictures and 5,000 videos with hash values matching files of child pornography on record in a NCMEC database. Even as evidence was collected from the residence, FBI agents continued to investigate by interviewing Appellant and later assuming his Kik identity. Appellant gave this authorization after admitting he used the laptop to access links to child pornography he forwarded from his smartphone. After the FBI relinquished its investigation to the AFOSI, AFOSI agents continued to investigate, including by obtaining evidence from Appellant's Dropbox account.

Assuming the warrant was initially lacking in probable cause, even without evidence obtained from Dropbox, Appellant's admissions to the FBI would have "inevitably led to the discovery of the evidence in a lawful manner." *United States v. Eppes*, 77 M.J. 339, 347 (C.A.A.F. 2018). With evidence AFOSI agents obtained later from Dropbox, it was nearly certain that would be the case. We reach this conclusion for three principal reasons, each premised on the assumption that probable cause was initially insufficient to search and seize digital devices that could not accommodate the Kik messaging application.

First, we find that presumed illegality would not preclude the Government from relying on the fruits of Appellant's admissions to the FBI to meet its burden under the inevitable discovery doctrine. Here, there is no genuine question of probable cause to search and seize mobile devices and their contents, such as Appellant's smartphone. Because Appellant's main challenge to the search warrant is its scope, we can analogize cases where concern was raised about statements tainted by an illegal arrest or search. In *New York v. Harris*, for example, the Supreme Court found that the exclusionary rule did not bar the use of a statement made by a defendant outside his home. 495 U.S. 14, 21 (1990). The Court reached this conclusion even though the statement was taken after an illegal warrantless arrest was made inside the home that was nonetheless founded on probable cause. *Id*. Similarly, in *United States v. Khamsouk*, the CAAF found that an appellant's warned statement to police during continued custody based on probable cause to apprehend was properly

admitted into evidence despite the fact that he was apprehended during an illegal search. 57 M.J. 282, 294 (C.A.A.F. 2002). Here, there is no dispute the FBI had probable cause to arrest Appellant in his home and search for evidence of child pornography on a mobile device. Thus, Appellant's warned admissions incident to his arrest and the search of his home were untainted by illegality.

Second, FBI agents knew from their interview with Appellant after proper rights advisement and waiver that he used a laptop to follow links to a Dropbox account where child pornography was kept. Appellant admitted using those links to view images of children as young as 12 to 13 years of age performing sexual acts. Knowing that Appellant's criminal conduct reached a laptop he kept in his residence, the FBI had actual knowledge that contraband was not limited to a mobile device such as the smartphone he used to access Kik.

Third, Appellant told the FBI he saved passwords on a spreadsheet on a network hard drive that he acknowledged he could access "from anywhere" and at "anytime." Only one external hard drive was seized. Assuming probable cause was initially lacking, there would have been a substantial basis for a magistrate judge to conclude that child pornography would be found on a device where Appellant kept other information he valued that allowed him access to websites on the Internet.

Under these circumstances, it is "reasonable to conclude officers would have obtained a valid authorization had they known their actions were unlawful" when they searched Appellant's home. *Eppes*, 77 M.J. at 347 (citation omitted). Because the inevitable discovery doctrine applies, the military judge did not abuse her discretion in denying Appellant's motion to suppress on this basis, even if the magistrate judge lacked a substantial basis to find probable cause, as claimed.

## B. Admission of Appellant's Statements regarding Sexual Abuse of Nephew and Niece

Next, we consider Appellant's second assignment of error claiming that the military judge abused her discretion in finding that Appellant's admissions regarding touching his nephew and niece in a sexual manner were sufficiently corroborated to be trustworthy for admission.

Before arraignment, Appellant moved to prohibit introduction into evidence of his statements about touching his nephew and niece in a sexual manner.[12] Citing Mil. R. Evid. 304(c), Appellant sought to exclude those statements

---

[12] Appellant's motion included several attachments. One was a verbatim transcript of the FBI interview of Appellant in the sedan outside his home. Another was a verbatim transcript of Appellant's post-polygraph interview at the AFOSI detachment. As discussed in this opinion, both transcripts were subsequently admitted into evidence.

he made in the post-polygraph interview with the FBI agent on the basis that the Prosecution could not produce "independent corroborating evidence that would tend to establish the trustworthiness of [his] confession for it to be admitted at trial."

To meet its burden under the rule, the Prosecution relied on evidence that counsel for both sides provided to the military judge prior to a pretrial hearing to decide the matter. That evidence consisted of summaries of law enforcement interviews with Appellant's wife's family, and testimony given by the children's father (Appellant's brother-in-law) at a preliminary hearing under Article 32, UCMJ, 10 U.S.C. § 832. It consisted, also, of a summary of leave records and other evidence that showed Appellant visited, and had opportunities to visit, his wife's family in Missouri when Appellant and his wife lived in Texas. Trial counsel argued, moreover, that three videos Appellant was found to possess that showed men touching genitalia of sleeping females were admissible under Mil. R. Evid. 404(b) and "could provide further corroboration."[13] Additionally, trial counsel argued Appellant's admission to involvement in child pornography, combined with discovery of "11,000 NCMEC hits of child pornography" on his media devices, established the trustworthiness of the admissions at issue.

The military judge denied the motion and Appellant's statements were admitted at trial. The military judge concluded Appellant's admissions to fondling his nephew and niece "were trustworthy" and "sufficiently corroborated to satisfy the requirements" of Mil. R. Evid. 304(c). The military judge based her ruling on evidence relied on by counsel for both sides at the hearing. However, the ruling did not rely for support on trial counsel's Mil. R. Evid. 404(b) proffer. On this point, in a separate ruling, the military judge granted Appellant's motion to exclude the three videos under Mil. R. Evid. 404(b). Her corroboration ruling did not reach the question whether Appellant's admission to involvement in child pornography, as substantiated by independent evidence, had any bearing on the trustworthiness of Appellant's admissions to fondling his nephew and niece. At the same time, the ruling was silent whether evidence that Appellant had possessed child pornography could be used as independent corroborating evidence.

On appeal, Appellant challenges this ruling.

---

[13] The Government argued the evidence showed Appellant's "state of mind" and "intent to act on his sexual curiosity regarding his nephew and niece while both were asleep to fulfill [Appellant's] sexual desire of engaging in sexual acts with sleeping victims."

### 1. Additional Background

#### *a. First FBI Interview of Appellant*

As discussed above, two FBI agents interviewed Appellant in a sedan parked outside his home at the same time as other agents executed the search. With his hands cuffed in front, and a second agent in the back seat, Appellant was questioned about evidence the FBI uncovered that connected child pornography to his Kik username. Because of Appellant's association with child pornography, the FBI suspected him of sexual exploitation of children. Later in the interview, the lead FBI agent asked Appellant if he had "ever put [his] hands on a child in an inappropriate . . . and sexual way." The agent testified at trial that, at that point, "it looked like [Appellant] became close to starting to cry. I remember his mouth was trembling a bit and his eyes got kind of red and watery."

Both an audio recording and transcript of that interview were admitted into evidence in the findings portion of Appellant's court-martial. In reference to the question whether Appellant had sexual contact with a child, the agent told Appellant, "You're getting a little more emotional now than I think you were earlier." Appellant replied that he "wouldn't do that." Upon further questioning, Appellant stated he had "[n]ever" been a victim of abuse. In still more follow-up questioning, the FBI agent referenced Appellant's viewing child pornography and asserted that "someone who's viewed these images, they know that they probably shouldn't, and sometimes they've put their hands on kids, even though they know that they shouldn't."

The agent continued this line of questioning, explaining that such individuals "know this is a bad thing, but that's just the way that they're wired." The agent again asked Appellant if he had inappropriately touched a child, which Appellant once more denied. Appellant made similar denials in a pre-polygraph interview, and also during a polygraph that was administered by a different FBI agent later in the day at the AFOSI detachment.

#### *b. Admissions to Touching Nephew and Niece*

After the polygraph, Appellant was again interviewed by the FBI agent. That interview was videorecorded and a verbatim transcript was prepared. Both the videorecording and transcript were admitted into evidence. In time, Appellant disclosed that he fondled his nephew and niece during a visit with his wife's family.[14] At the time, Appellant and his wife were living on Dyess Air

---

[14] Appellant also contests the evidentiary sufficiency of his convictions for sexual abuse of his nephew and niece. This opinion further discusses in more detail, *infra*, Appellant's admissions that the Government used at trial.

Force Base (AFB), Texas, and they drove to visit her family "in Missouri a couple times." The families would "visit [with] each other a lot." Appellant believed his nephew was 12 or 13 years old, and his niece was two years younger than her brother. Appellant told the agent he recalled that their ages were "somewhere around there," but allowed he "[could not] remember."

Appellant initially disclosed sexual contact with just his nephew, but then revealed he also fondled his niece. Appellant described how both children fell asleep on the living room floor after they had stayed up late watching movies. While his nephew slept, Appellant touched his nephew's penis with his hand after pulling down the pajama bottoms his nephew was wearing. Appellant recalled that his nephew had an erection but did not wake up. After touching his nephew, later that same evening Appellant touched Appellant's niece as she slept. Appellant acknowledged he fondled her vagina over her underwear and, in his telling, her vagina "was a little moist." Appellant told the agent his niece woke up and went to the bathroom and that she was unaware of what he had done. Afterward, Appellant either fell asleep on the floor or went to sleep in a bedroom where his wife was sleeping.

Initially, Appellant recalled the incident with his nephew and niece occurred in the living room when he and his wife visited with her family sometime in January or February 2011. Five times during the interview, Appellant said it happened during that timeframe because he recalled that the incident was during his "R and R" after he returned home in the winter from an overseas deployment.[15] At the conclusion of the same interview, however, Appellant placed the timeframe for the visit in summer 2011.

Appellant also admitted touching just his nephew in the same way under identical circumstances on a subsequent visit with his wife's family, again in Missouri. On this second occasion, like the first, Appellant's nephew was asleep and did not stir when Appellant initiated sexual contact. Appellant told the FBI agent he was unsure when the second visit occurred, initially saying it was in "summer of 2011." Appellant corrected himself, and then consistently stated that the second visit occurred when he and his wife again visited her family, but in 2012, before his nephew and niece returned to school.

### c. Government's Evidence of Corroboration

Special agents of the AFOSI undertook to substantiate Appellant's statements about fondling his nephew and niece. At trial, the Government relied on

---

[15] We understand Appellant was authorized an administrative absence from his unit during a period of Rest and Recuperation, or "R and R," before resuming military duties at his home station. Such post-deployment absences are not typically charged as annual leave.

Appellant's travel and leave records to corroborate Appellant's admissions. A travel voucher showed that Appellant redeployed to Dyess AFB on 28 January 2011. Appellant's leave records showed eight periods of charged leave during the four-year period 2010 through 2013, as follows: 5 days in February 2010, 7 days in June 2010, 21 days in March and April 2011, 3 days in July 2011, 23 days in March 2012, 8 days in March and April 2012, 15 days spanning December 2012 and January 2013, and 24 days in May and June 2013.

The Government also relied on AFOSI interviews with Appellant's sister-in-law, brother-in-law, and nephew and nieces to corroborate Appellant's admissions. The military judge included that information in her ruling. The military judge's factfinding was substantially in agreement with evidence introduced by the Prosecution on the merits.

### i) Appellant's Sister-In-Law

During the relevant period, Appellant and his wife were living at Dyess AFB in Abilene, Texas. At that time, Appellant's sister-in-law—the mother of Appellant's nephew and niece—was a Soldier in the United States Army. Beginning in April 2010, the sister-in-law was stationed in San Antonio, Texas, where she lived with her husband and their three children until she left for a two-year assignment in South Korea in the fall of 2011. As found by the military judge, during the time Appellant's sister-in-law was stationed in San Antonio, she and her family visited with Appellant and his wife at Dyess AFB, Texas, maybe three or four times.

In the findings portion of the court-martial, Appellant's sister-in-law testified about the congenial relationship between families when they both lived in Texas. Because of proximity, they visited "frequently" for three or four days at a time. In her telling, "I can't tell you how many times a year that would happen, but I know we visited each other frequently." When her family visited with Appellant and his wife, at night her children would fall asleep watching movies in Appellant's living room. One summer, her children stayed with Appellant and his wife in their home at Dyess AFB for a week.

In November 2011, Appellant's sister-in-law began a two-year assignment in South Korea. Initially, her husband and children remained in San Antonio. That changed in June 2012 when she took leave to move her husband and children to her parents' apartment in a suburb of St. Louis, Missouri. At the time, her parents were living in a two-bedroom apartment. Before she completed her overseas tour in November 2013, her parents moved into a house they bought in a nearby suburb, also in St. Louis. Her husband and children moved with her parents and lived in the house for a brief period until she completed her overseas tour, after which she moved with her husband and children to Colorado.

### *ii) Appellant's Brother-In-Law*

In like manner as his wife, Appellant's brother-in-law testified that his family moved to San Antonio in April 2010. He testified to the agreeable relationship between families when his wife and Appellant were both stationed in Texas. His family visited Appellant and his wife about three times on weekends and holidays. One time, his children stayed with Appellant and his wife on their own after his wife departed for South Korea. On another occasion during his wife's overseas tour, both he and his children stayed with Appellant and his wife when the families celebrated the Christmas and New Year's holidays together. During visits to Appellant's home, at night the children and Appellant slept in the living room.

The brother-in-law recalled his wife taking mid-tour leave to help him move their family from San Antonio to her parents' two-bedroom apartment outside St. Louis. This happened in summer 2012. Except for occasions when Appellant's brother-in-law was working in a different state, he lived in that apartment, with his wife's parents and his children, until October 2013 when her parents purchased a house in an adjoining neighborhood. He and the children moved with his wife's parents and lived in their new home for about one month before his wife completed her overseas tour and redeployed to the United States.

The brother-in-law recalled that Appellant made two overnight visits to Missouri when his wife was overseas. Appellant's wife did not accompany Appellant on either visit. The first occasion was a two-day visit in May 2013 when the brother-in-law and his children were still living in the two-bedroom apartment. He recalled that his children and Appellant slept in the living room. The brother-in-law could not remember the dates of Appellant's second visit, the sleeping arrangements, or whether they were still living in the apartment.

### *iii) Appellant's Nephew*

Appellant's nephew had a mid-to-late summer birthday. He was 11 years old in the January to February 2011 timeframe when his family lived in San Antonio. He had no memory of Appellant touching him inappropriately. As found by the military judge, the nephew remembered Appellant "visiting his family while they lived in Missouri in approximately 2011–2012. He also remembered his mother being there" on that occasion. He "remembered one instance where he fell asleep while in the same room as [Appellant] when [Appellant] visited Missouri." The nephew "fell asleep on the couch while [Appellant] visited, but his mother was present." He remembered he "woke up and got carried to his room."

In the findings portion of the court-martial, the nephew testified about visiting Appellant's home in Texas before his family moved to Missouri. During

such visits, there were times when he and his sisters[16] and possibly Appellant stayed up late watching movies. There were occasions when he had fallen asleep while watching movies. However, he had no memory of a time when he and his sisters and Appellant fell asleep watching movies. The times they did watch movies with Appellant were when he and his sisters visited Appellant in Texas, and not when his family lived in St. Louis, Missouri. He could not recall an occasion when Appellant visited them in St. Louis when his mother was stationed overseas. He testified his grandparents' apartment had a living room that was too small for even one person to lay on the floor. He testified his father "wasn't present" the entire time he and his two sisters lived with grandparents in Missouri.

### iv) Appellant's Older Niece

Appellant's older niece, who was the named victim, had a mid-to-late autumn birthday. She was nine years old in the January to February 2011 timeframe when her family lived in San Antonio. Like her brother, she had no memory of Appellant touching her inappropriately. She too had no memory of Appellant visiting them in Missouri when she and her siblings lived with their grandparents and their mother was stationed overseas. Like her brother, she remembered watching movies with Appellant when Appellant and his wife lived in Texas. As found by the military judge, the niece "saw [Appellant] and his wife a lot when her family lived in Texas before [she] moved to Missouri." She "remembered watching movies with [Appellant] in his living room." She "described a time where she and her siblings were alone with [Appellant] during a visit to [Appellant]'s home in Texas: 'A bunch of us, or all of us, we bunked on this air mattress in the living room he set up and we fell asleep watching movies.'" She "believed her aunt visited her family in Missouri, but she could not recall if [Appellant] came [too]."

In the findings portion of the court-martial, the niece testified that she and her siblings never lived in separate households apart from each other. She recalled visiting Appellant in Texas and sleeping with her siblings on "an air mattress in the living room." In her telling, she could "remember [watching] a lot of movies . . . [e]very night," and "we would always fall asleep in the living room while we were watching movies." In response to a question by trial counsel, the niece was clear that her "uncle [Appellant], and [her] aunt, [her] brother, and [her] little sister" watched movies together. In response to a clarifying question by the military judge, the niece could not recall if Appellant would fall asleep on an air mattress on the floor. She also did not recall if Ap-

---

[16] Appellant had two nieces, both younger than their brother (Appellant's nephew). Appellant was convicted of aggravated sexual contact upon the older niece.

pellant visited them after they moved to St. Louis and lived with their grandparents. Contrary to her brother's testimony, she recalled that her father lived with her and her siblings when they lived in their grandparent's apartment in St. Louis, and the four slept in the same room.

### *v) Appellant's Younger Niece*

Like her older brother and sister, Appellant's younger niece remembered watching movies with her siblings and Appellant. As found by the military judge, she remembered watching movies with Appellant at his home in Texas. She also remembered visits from Appellant and his wife when she and her siblings lived with her grandparents in St Louis. During those visits, they watched movies together and fell asleep on an air mattress.

In the findings portion of the court-martial, the younger niece recalled visits to Appellant's home when both families lived in Texas. She testified that Appellant would also visit her family and stay overnight in their home. In both places, during visits with her uncle, she recalled watching movies and sleeping in the living room on an air mattress with her siblings and Appellant. Unlike the evidence that the military judge relied on in her ruling, the younger niece had no memory of Appellant visiting her family when they lived in Missouri.

### 2. Law

A military judge's ruling that Mil. R. Evid. 304(c) does not bar an admission or confession of an accused will not be disturbed except for an abuse of discretion. *United States v. Jones*, 78 M.J. 37, 41 (C.A.A.F. 2018) (citation omitted). "A military judge abuses h[er] discretion when: (1) the findings of fact upon which [s]he predicates h[er] ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if h[er] application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citation omitted).

Mil. R. Evid. 304(c) allows the Prosecution to introduce into evidence an admission or confession of an accused upon a showing of trustworthiness. After briefs were initially submitted in this case, our superior court decided *United States v. Whiteeyes*, a case that considered the question whether independent evidence established the trustworthiness of an appellant's statements. 82 M.J. 168 (2022).[17] Before such a statement may be admitted into evidence, the Prosecution "must proffer to the military judge evidence that it believes corroborates the accused's statement." *Id.* at 174. "[T]he military judge may admit into evidence each piece of the proffered evidence on a conditional basis in order to

---

[17] The Government cites *Whiteeyes* in a 16 June 2022 Motion to Submit Supplemental Citation of Authority, which the court granted without opposition on 27 June 2022.

make his or her [Mil. R. Evid.] 304(c) determination." *Id.* (citing Mil. R. Evid. 104(b)).

In *Whiteeyes*, the CAAF used a three-part test to evaluate whether a military judge's ruling to admit evidence under Mil. R. Evid. 304(c) was an abuse of discretion. That test asks three questions which closely track the requirements under the rule, and may be summarized as follows:

- Is the proffered evidence, either direct or circumstantial, in fact, *independent* evidence as provided in Mil. R. Evid. 304(c)(1)?

- Does "each piece of independent evidence raise[ ] an inference of the truth of the admission or confession" as provided in Mil. R. Evid. 304(c)(2)? "If an individual piece of independent evidence meets this threshold, the military judge may then use that evidence in the process of determining whether the accused's statement is corroborated," which is the next and last question.

- Do the "pieces of independent evidence, considered together, . . . tend to establish the trustworthiness of the admission or confession" under Mil. R. Evid. 304(c)(1)?

*Whiteeyes*, 82 M.J. at 174 (internal quotation marks and citations omitted).

Each requirement of the rule must be met. If so, a military judge does not abuse her discretion in answering each of the three questions in the affirmative, *see id.* at 175–76, and the trier of fact may lawfully consider an accused's admission or confession "as evidence against the accused on the question of guilt or innocence," *id.* at 175 (quoting Mil. R. Evid. 304(c)(1)).

**3. Analysis**

The Government argues the military judge did not abuse her discretion by finding sufficient corroboration to allow Appellant's admissions to be used as evidence against him at trial. The Government relies on evidence that was before the military judge when she ruled on Appellant's motion. For the first time on appeal, the Government identifies two additional pieces of evidence as corroboration. First, the Government contends that "the vast amount of child pornography" found on Appellant's media devices "confirmed his sexual interest in children and motive to commit the offenses" involving his nephew and niece.[18] Second, the Government points to initial questioning by the FBI when

---

[18] The court assumes the Government's argument is founded in Mil. R. Evid. 404(b). We note that this argument is related to, but nonetheless different from, trial counsel's argument at the motions hearing. At that hearing, trial counsel argued Appellant's admissions to abusing his nephew and niece were trustworthy because his admissions

Appellant was first asked if he had ever touched a child. The Government argues Appellant's visibly emotional response to this line of questioning was evidence of his consciousness of guilt and supports the reliability of later admissions to touching his nephew and niece.

Before using the *Whiteeyes* framework to examine the military judge's ruling, we note that the additional pieces of evidence on which the Government urges the court to rely raise several important issues: (1) whether Appellant's motive and intent to fondle his nephew and niece may be shown by evidence of Appellant's later involvement in child pornography offered under Mil. R. Evid. 404(b); (2) whether this court can consider such evidence as corroboration when it was neither proffered at the motions hearing, nor offered at trial for the purposes that the Government now claims are relevant on appeal; and (3) whether evidence of Appellant's changed demeanor under questioning by the FBI agent in the sedan can be used as independent evidence for corroboration purposes, as advanced by the Government for the first time on appeal.

Although we need not decide the first and second issues, we do resolve the third issue. In our application of the *Whiteeyes* three-part test, we will also evaluate evidence of Appellant's changed demeanor when the FBI agent asked him if he had ever put his hands on a child in an inappropriate and sexual way. We consider this evidence because it was before the trier of fact despite the fact that it was not addressed by the military judge's corroboration ruling. For authority to do so, we principally rely on the direction given to this court by our statutory authority to evaluate findings of guilty "on the basis of the entire record." Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1).

Consistent with that authority, in *United States v. Perkins*, the CAAF acknowledged "[a] familiar principle of appellate practice is that an appellee or respondent may defend the judgment below on a ground not earlier aired." 78 M.J. 381, 386 n.8 (C.A.A.F. 2019) (alteration, internal quotation marks, and citations omitted); *see also United States v. Bess*, 80 M.J. 1, 11–12 (C.A.A.F. 2020) (approving Court of Criminal Appeals' decision to uphold the ruling of a military judge for a different reason than the ones on which the military judge relied). We also find persuasive the concurring opinion by Judge Hardy in *Whiteeyes*, which considered the findings testimony of an expert witness even though "the military judge did not have the benefit of the expert witness' testimony when he ruled on Appellant's motion." 82 M.J. at 180 (Hardy, J., concurring in the judgment). Judge Hardy noted that testimony was "properly included in the joint appendix and can be considered by this Court." *Id.* The opinion of the court in *Whiteeyes* similarly relied on that expert witness's testimony

---

to committing child pornography offenses in an earlier FBI interview was substantiated by evidence found on his digital devices.

to evaluate whether the military judge erred in ruling that the appellant's statements were sufficiently corroborated. *Id.* at 175–76. Accordingly, we will evaluate evidence relied on by the military judge in her ruling along with evidence of Appellant's emotional response to questioning about sexually touching children.

We turn then to consider the military judge's ruling that permitted the Prosecution to introduce Appellant's admissions to fondling his nephew and niece. We do so following the procedures and standards that the CAAF applied in *Whiteeyes* to the statements at issue in that case. *See id.* at 174. We find the military judge did not abuse her discretion in concluding that Appellant's admissions were sufficiently corroborated to be used against him at trial.

### a. Independent Evidence

With respect to whether the proffered evidence constituted independent evidence, we find the military judge did not abuse her discretion in concluding that it did. In reaching this conclusion, the military judge relied on "evidence presented by the Government in the form of AFOSI's interviews with the named victims and other family members, sworn Article 32, UCMJ, preliminary hearing testimony, and other independent evidence" that we describe above. The military judge did not abuse her discretion in ruling that these pieces of evidence constituted "independent evidence" as provided in Mil. R. Evid. 304(c)(1). We summarize that evidence here:

First, evidence independent of Appellant's admissions to the FBI showed that Appellant's nephew and niece were children of his wife's sister. That same evidence, the miliary judge found, confirmed "their ages were similar to those provided by [Appellant]" to the FBI.

Second, the military judge found that independent evidence showed Appellant visited with his wife's family, including his nephew and niece, during the timeframe that he said he committed the offenses. As found by the military judge, this showed Appellant "had opportunities to commit the crimes he confessed to committing in approximately 2011 and 2012."

Third, the military judge found that Appellant's military leave and other records tended to show "many times" Appellant was authorized leave when he and his wife lived within driving distance for overnight visits with his wife's family. The military judge further noted that "some [leave records] corroborate the dates of [Appellant]'s confessions" and "tend to show additional opportunities" for visits with his nephew and niece.

Fourth, the military judge found that Appellant's nephew and niece "distinctly" remembered incidents of watching movies with Appellant and then falling asleep, and that their ages during these incidents generally lined up with Appellant's description of their ages during his admissions to the FBI.

Although his nephew and niece did not necessarily recall these incidents happening when they lived in Missouri, the military judge found that their "younger sister distinctly remembered sleeping in the living room with her older siblings and [Appellant] in Missouri."

Fifth, the military judge noted that Appellant's nephew and niece did not recall Appellant "ever touching them," which was consistent with the way that Appellant "claim[ed] to have committed the charged offenses," namely that the children "were asleep and did not wake up while he inappropriately touched them."

Additionally, Appellant's emotional response to FBI questioning about sexually touching children was a nontestimonial act tending to show consciousness of guilt. *See United States v. Clark*, 69 M.J. 438, 444 (C.A.A.F. 2011) (accused's demeanor admissible "where it is relevant to an accused's 'consciousness of guilt'"); *United States v. Cook*, 48 M.J. 64, 66 (C.A.A.F. 1998) (nontestimonial acts admissible to show consciousness of guilt); *United States v. Baldwin*, 54 M.J. 551, 556 (A.F. Ct. Crim. App. 2000) ("Because consciousness of guilt can be used as circumstantial evidence of guilt, we find it may also be used in evaluating whether a confession meets the test for corroboration under the rule."); *see also United States v. Borland*, 12 M.J. 855, 857 (A.F.C.M.R. 1981) (noting that "[a]dmitting evidence tending to show the accused's consciousness of guilt is an accepted principle of military jurisprudence"). We find circumstantial evidence of Appellant's demeanor during initial FBI questioning did not consist of "[o]ther uncorroborated confessions or admissions of the accused that would themselves require corroboration" to be admitted against Appellant. *Whiteeyes*, 82 M.J. at 175 (quoting Mil. R. Evid. 304(c)(2) (*Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*))). Thus, we consider Appellant's emotional response during questioning as independent evidence as may bear on the sufficiency of corroboration.

### b. Inference of Truth

With respect to whether each piece of independent evidence raises an inference of the truth of Appellant's admissions, we again conclude that the military judge did not abuse her discretion. The circumstances of the family visits, the setting in which Appellant watched movies with his nephew and niece until they fell asleep, and their ages, raise inferences of the truth of Appellant's admissions.

In regard to Appellant's description of visiting his sister-in-law's family in Missouri sometime in January or February 2011, the evidence on these points is mixed. We have misgivings that Appellant's description of committing the first offenses during a visit with his wife's family in Missouri, and early 2011 timeframe, are mutually correct. For this same reason, the Government allows

that Appellant "perhaps mistakenly believed" his first offenses "occurred in Missouri" and not Texas. On this point, Appellant's sister-in-law testified that her family lived in Texas from 2010 until her family moved to Missouri in summer 2012. Both of Appellant's nieces recalled instances, when they lived in Texas, of Appellant watching movies with them and their brother in the living room until they fell asleep. Nonetheless, the circumstances of these visits—wherever and whenever they occurred—show that Appellant had access to his nephew and niece and raise an inference of the truth of Appellant's admissions. Likewise, independent evidence of the setting whereby he would lay with the children at night on the living room floor after watching movies raises an inference of the truth of his admissions.

Regarding the fact that Appellant's nephew and nieces were unaware of Appellant fondling the nephew and older niece, the corroboration rule provides that "[a] piece of independent evidence may reach this threshold even where it 'raises an inference of the truth' only when considered alongside other independent evidence." *Id.* at 174 (quoting Mil. R. Evid. 304(c)(2) (2016 *MCM*)). The military judge found the children's lack of awareness "may justify a jury's inference that [Appellant]'s statements were true given the specific way the accused claims to have committed the charged offenses," namely that Appellant's nephew and niece "were asleep and did not wake up while he inappropriately touched them." We agree with the military judge's conclusion on this issue.

In regard to Appellant's visibly emotional response to questioning about sexually touching children, we conclude that this reaction raises an inference of the truth of Appellant's admissions. According to the FBI agent's testimony, Appellant shuddered, and his eyes became red and watery when he was asked if he had "ever put [his] hands on a child in an inappropriate . . . and sexual way." Appellant's emotional reaction to that question permitted the inference that he had touched a child in such a manner. Put differently, Appellant's emotional reaction to the agent's question allowed an inference that Appellant had fondled his nephew and niece.

### c. Trustworthiness of Statements

Finally, with respect to the question whether the pieces of independent evidence, considered together, tend to establish the trustworthiness of Appellant's admissions, we find that the military judge did not abuse her discretion in concluding that they did.

Appellant argues the Government failed to independently establish both the time and place of the sexual contact Appellant was alleged to have committed upon his nephew and niece. First, Appellant argues the admissions do not provide a timeframe narrower than the charged timeframe for the alleged of-

fenses—between on or about 28 January 2011 and 27 June 2012. In that regard, there was no evidence of the day, month, or even the year that Appellant allegedly committed the charged acts. Second, Appellant argues that, even in closing argument, the Government could not say if the alleged abuse occurred in Texas or Missouri. We accept both points and at the same time dismiss their significance because independent evidence of the circumstances, setting, and the children's ages tend to establish the trustworthiness of Appellant's admissions.

Independent evidence shows Appellant had the opportunity to commit the offenses in the manner he described to the FBI. His wife's family described spending time with Appellant and his wife during long weekends and holidays. They recalled overnight visits when Appellant lay on a living room floor with his nephew and niece watching movies. Appellant's sister-in-law, brother-in-law, and both nieces described evenings when Appellant slept on the living room floor with the children. The children's accounts that they could not recall Appellant's conduct were consistent with furtive touchings Appellant described to the FBI. The actual and relative ages of Appellant's nephew and niece during the relevant period were consistent with Appellant's description to the FBI.

Finally, Appellant's emotional response when first asked if he had ever touched a child tends to establish the trustworthiness of Appellant's later admissions, in a separate interview with the FBI, to fondling his nephew and niece. This evidence substantiates Appellant's admissions and tends to show he committed the offenses in the manner he described to the FBI. We consider this evidence, along with independent evidence of circumstances of the family visits, the setting of Appellant's interaction with his nephew and niece, and their ages. We conclude the military judge did not abuse her discretion in finding sufficient independent evidence established the trustworthiness of Appellant's admissions to fondling his nephew and niece as charged.

### d. Conclusion

In order for the court to reverse a ruling for an abuse of discretion, we must have far more than a difference of opinion. *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987) (citation omitted). An abuse of discretion occurs when the underlying reasoning is clearly untenable and amounts to a denial of justice. *Id.* (citation omitted). The court must find the reasoning was "arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *Id.* (internal quotation marks and citation omitted).

At the time of the military judge's ruling, our superior court's precedent described the quantum of evidence needed for corroboration as "slight." *United States v. Jones*, 78 M.J. 37, 42 (C.A.A.F. 2018) (citation omitted); *see also*

*United States v. Melvin*, 26 M.J. 145, 146 (C.M.A. 1988); *United States v. Yeoman*, 25 M.J. 1, 4 (C.M.A. 1987) (citation omitted). The *Whiteeyes* framework reinforces this low threshold while emphasizing that "these precedents retain their value . . . ." 82 M.J. at 174 n.6. Although the military judge did not have the benefit of our superior court's decision in *Whiteeyes* when she ruled on the motion, we do not find an abuse of discretion in her application of Mil. R. Evid. 304(c) to the facts of this case.

## C. Legal and Factual Sufficiency

Appellant challenges the legal and factual sufficiency of his convictions for aggravated sexual abuse of his nephew on divers occasions, and aggravated sexual contact upon his niece, in violation of Article 120, UCMJ.[19] Appellant contends that the convictions were the result of "a false confession from [Appellant] after nine hours of custodial interrogation" and that "the Government's case rested *solely* upon" said false confession. For the reasons described next, we find both convictions legally and factually sufficient.

### 1. Additional Background

The evidence used to convict Appellant is founded on his admissions to the FBI. For this reason, we summarize the FBI interviews with Appellant in more detail.

#### a. FBI Interview with Appellant outside his Residence

The FBI's custodial interview with Appellant in the sedan parked outside his residence lasted about two hours. It began with the lead agent advising Appellant of rights under *Miranda*,[20] which Appellant waived, reading out loud, "I have read the statement of my rights and I understand what my rights are. At this time I am willing to answer any questions without a lawyer present." During the interview that followed, Appellant acknowledged verbal and written consent for the FBI to "assume and use [his] online identity," to include accessing his online Kik account. Appellant also acknowledged giving his "consent freely and voluntarily without fear, threats, coercion, or promises of any kind." He read from a statement prepared for him, acknowledging that he

---

[19] In his assignment of error, Appellant also claims his conviction for distribution of child pornography is legally and factually insufficient. However, the assignment of error brief fails to challenge the evidentiary sufficiency of this conviction or provide any other explanation for why the conviction is legally and factually insufficient. To the extent Appellant alleges otherwise, the court has carefully reviewed the record and finds Appellant's conviction for distribution of child pornography both legally and factually sufficient. This issue warrants neither further discussion nor relief. *See Matias*, 25 M.J. at 361.

[20] *Miranda v. Arizona*, 384 U.S. 436 (1966).

"ha[d] been advised of [his] right to refuse to allow the FBI to assume [his] online identity, and [he] hereby voluntarily waive[d] this right."

Questioning began with the lead FBI agent asking Appellant about his personal situation and other background information. Appellant told the agent he was 37 years old. He was a master sergeant (E-7) with 18 years of active-duty service. He worked on aircraft electrical systems as a maintenance technician. Before enlisting in the Air Force he completed a year and a half of college. Appellant explained how he had been assigned to several overseas locations in addition to temporary duty and deployments in support of military operations overseas. He described his current stateside duties as "working for the colonel as liaison for our maintenance group over here to discuss the sustainment of our aircraft." Those duties included coordinating with a major defense contractor. At the time of the interview, Appellant was a homeowner and had been married for 14 years.

Throughout the interview, the FBI agent was responsive to Appellant's requests to adjust the temperature in the sedan and, at one point, offered Appellant a blanket. The agent did not offer Appellant any breaks and Appellant did not ask for one. At the end of the interview, the agent asked Appellant if would be willing to submit to a polygraph interview. Appellant agreed and was transported to the AFOSI detachment.

### b. Subsequent FBI Interviews at the AFOSI Detachment

A different FBI agent conducted several more interviews with Appellant at the AFOSI detachment. Appellant arrived around 0900 and the third and final interview concluded at 1515. When he arrived, Appellant was offered food, water, and a restroom break. At no point was Appellant denied a request or other comfort items. Appellant was not handcuffed during questioning.

The FBI agent began the first interview by re-advising Appellant of his *Miranda* rights. Appellant again waived those rights and the agent proceeded with pre-polygraph questioning. The second interview consisted of the polygraph itself. Both before and during the polygraph, the agent asked Appellant if he had ever touched a minor in a sexual way. The agent asked Appellant this question several times and in different ways with the same result: Appellant denied any sexual touching of a child and his denials, at times, were adamant. During the post-polygraph interview, Appellant changed his initial denials into admissions that he had sexual contact with his nephew and niece while they slept.

### i) Initial Post-Polygraph Questioning

A post-polygraph interview was the third and final FBI interview with Appellant at the AFOSI detachment. We describe that interview in some detail

as it bears on Appellant's claim that his subsequent statements of sexual contact with his nephew and niece were not only unreliable, but false.

The interview began when the same FBI agent related he had "no doubt" that Appellant had "sexual contact with a minor." The agent told Appellant he was uncertain "when that occurred in [Appellant's] life," but professed he "ha[d] no doubt that it has occurred at some point." The agent then presented Appellant with a proposition he garnered from questioning Appellant earlier in the day. During a previous conversation, Appellant had disclosed that his wife was unfaithful while he was deployed. In this final interview, the agent offered the wife's betrayal as reason why Appellant would engage a minor in a sexual way. The agent asserted, "When your wife was unfaithful[, s]omething happened during that time, and you haven't been completely honest with me." Twelve times during the interview the agent reinforced the wife's infidelity as a reason why Appellant had sexual contact with a minor. The agent reinforced that betrayal theme even after Appellant's subsequent admissions to fondling his nephew and niece.

Before those admissions, the agent frequently stressed that all he was "really concerned about was actual physical sexual contact" between Appellant and a minor. The agent told Appellant, "What's really important is not that we make mistakes, but how we respond when we make those mistakes." The agent explained, "I really need you to be completely honest with me and tell me what happened, when it happened, [and] who it was with, okay[?] Because the only way to move past this is to acknowledge that and we can move forward from there." He stated he wanted Appellant "to have a life moving forward from here," and "the best way to get to that place" was "to take responsibility for what's been done."

At one point, the agent remarked that based on responses Appellant gave to earlier questioning, the agent believed Appellant was still thinking "about something else that [Appellant] [did not] want, yet, to share" with the agent. The agent remarked about that "something else," which Appellant had not yet disclosed:

> Q [FBI Agent]: . . . [It is s]omething that [ ] is not part of who you are on a regular basis, not something that you would choose to do today, okay[?]
>
> A [Appellant]: Mm-hm.
>
> Q: But something that in a different time, in a different place, when you were in a confused and frankly dark place, your wife's betrayal of you. I mean, that's about as bad a betrayal as anybody can have happen to them, right?
>
> A: Mm-hm.

The agent then offered a setting personal to Appellant in which Appellant might have engaged in sexual contact with a minor. In the agent's telling, he predicted it was a consensual setting in contrast to forced:

> **Q** [FBI Agent]: And so, I get that sense of pain, of confusion. I get the fact that you were kind of tentatively exploring the idea of maybe interest in a homosexual relationship kind of thing, and during that time started watching videos of younger males, both homosexual and heterosexual engaged in sexual activity, right. It makes sense to me that during that time something would have happened. And my guess is also, *it wasn't the kind of situation that it was a forceful* [sic], that you made somebody [sic]. Most commonly, and believe me I talk to a lot of folks that get in this place, *it is kind of a mutual exploration*, particularly with younger teens, particularly young male teens, I mean, we both know what it's like to be a young male teen, right?
>
> A [Appellant]: Mm-hm.
>
> Q: They are about as interested constantly in sex as they can be interested. I mean, that's what young male teens do, right[?]
>
> A: Mm-hm.
>
> Q: So again, given all those environments, and given the fact that my strong guess, and again, I don't know, but just based on what I'm kind of assessing about your personality, that you're not the type of person that's going to, you know, rape somebody. *It's going to be a consensual kind of thing.* It's going to be something that . . . you wanted to explore, maybe it is one of those things where afterwards, you know . . . ["]it's not what I want to do.["] I don't think it was a forceful situation. *I think it was a consensual situation*, but that's what, again, makes sense to me given that environment and that context.
>
> A: Mm-hm.

(Emphasis added).

The agent reinforced the contrast between consensual and forced contact with a minor by encouraging Appellant, telling Appellant he wanted to give Appellant "the benefit of the doubt." The agent told Appellant he had "a pretty good sense of people," and that Appellant "d[id]n't strike [the agent] as a predator." He then reintroduced a supposition that Appellant was not predator by offering reassurance that Appellant was

> basically a good guy that's worked very hard, that has taken care of his family his whole life, has been the oldest son that was a

dutiful son who wasn't allowed to kind of explore a lot of the normal things growing up in a very traditional home, that ended up in a place where his wife betrayed him, and was confused. And something in that environment, in that time, in that space occurred. *And again, I don't think it was forced. I think it was consensual.* You may not have even known how old he really was at the time. But something happened and that's what we've got to get to now . . . . So, what happened during that time . . . ? I know something--I can see in your body. I can literally see it wanting to come out. I mean, it's--I spend a lot of time talking to people. And I know it's hard for you to recognize this yet, but inevitably once that weight is lifted from your shoulders, people can start getting control of their life again. So, what is it? What is weighing you down right now?

(Emphasis added).

In response to this question, Appellant stated, "It was--no, I mean, it's hard to explain, but *it's not like there was anything like with other people sexually like that.*" (Emphasis added). A short time later, the agent again offered that a minor had willingly engaged in sexual conduct with Appellant. Appellant again rejected that premise, which the agent immediately challenged:

Q [FBI Agent]: And the fact that you are still, even as early as, you know, earlier this year, still looking at that type of child pornography, okay, tells me that there is part of you that is obviously attracted to that, right[? O]therwise you wouldn't be doing it, right[?]

A [Appellant]: Mm-hm.

Q: And given that that is an attraction, it makes sense that given the opportunity, given an environment where you're feeling lost and confused, *given the fact that undoubtedly, most likely he'd frankly, wanted to engage in the activity----*

A: *There's nobody that wanted to do that.*

Q: So, see I don't--I just--I can't--I can't accept that [ ].

(Emphasis added).

Appellant acknowledged he had never "forced" himself "on someone else." The agent then returned to a supposition Appellant had twice rejected: "So, then it's a consensual situation, it's a mutually enjoyable situation, it's not a repeated pattern, it's one time or two times, it's not a habit, it's not something you're doing on a regular basis. And that's where we're at right now." The agent told Appellant to "just let it out," and stated, "Just tell me what happened in a

physical way during that time in your life." Appellant replied, "I'm trying to explain to you"—at which time the agent cut Appellant off and told him, "Jonel, I mean, let me back up just a minute."

The agent then drew Appellant's attention to the premise that it was "a no-judgement place," and Appellant nodded his head up and down. The agent offered that "for millennia" the ancient Greeks and even modern-day men in another country have "all been attracted to young males." In the agent's telling, "Plato and Aristotle slept with eight-year-old boys all the time" even if that was a "politically incorrect fact of history that most people don't like to acknowledge." The agent also offered what "people don't want to acknowledge as well is that eight-year-old boys usually enjoyed it, all right."

The agent frequently spoke about revealing "truth" and getting to what the "truth is." At one point, he asked rhetorically, "Are there going to be consequences? Absolutely. Are there consequences to all of our actions? Absolutely. But the reality is those consequences are less when we know what the reality is, when what the truth is the truth." The agent suggested "something happened" in Appellant's life, that maybe Appellant was thinking about a time he "had physical contact with a minor" "in a different country," maybe when Appellant was "traveling overseas."[21] He offered a "guess" that Appellant had sexual contact with a minor during a "time of confusion" when he was "feeling betrayed" and "exploring something as fundamental as kind of [his] own sexual orientation."

### *ii) Admissions to Sexual Touching of Nephew and Niece*

In time, Appellant rejected the FBI agent's suggestions about the timeframe, reason, and setting in which he had sexual contact with a minor. He divulged that the incident he had yet to reveal "wasn't in this timeframe," in reference to a time when he learned his wife had been unfaithful. Appellant was dismissive, moreover, of the significance of the wife's infidelity, explaining there was another occasion when he deployed and his "wife did cheat on [him] also at that timeframe," and yet Appellant "came back, everything was fine, [and they] just moved on."

Appellant then told the agent how he fondled his nephew when he and his wife "were visiting family." He volunteered "[i]t was [his] nephew on [his] wife's side." Contrary to the FBI's agent's suggestion that Appellant might have had sexual contact with a minor in a consensual setting, Appellant volunteered that the incident with his nephew "d[id]n't seem consensual because [his

---

[21] The FBI agent told Appellant, "I don't think you're . . . kidnapping kids, tying them up, torching, raping, and killing. I don't think you're that."

nephew] was sleeping" at the time. The agent asked Appellant when this conduct occurred. Appellant did not initially recall, and in attempting to find a frame of reference, asked the agent about his earlier disclosures regarding when he returned from an overseas deployment:

> A [Appellant]: …[T]hat was a long time ago, 2000--when we moved to Texas, and then we ended up going to visit them in Missouri a couple times, but I never--that never happened until maybe--maybe later that summer 2011. When did I get back?
>
> Q [FBI agent]: 2011ish?
>
> A: Yeah. Somewhere shortly after that we made a road trip to visit them in Missouri and then we were just hanging out at their place, that's where we were at.

Appellant explained how one night he and his nephew were lying on the floor "in the living room watching TV." Appellant's two nieces were also present. After the children fell asleep, Appellant touched his nephew's penis with his hand and it was erect, but his nephew did not wake up. Appellant acknowledged he pulled down his nephew's pajama bottoms and fondled his nephew's penis. Appellant recalled his nephew was probably 12 or 13 years old at the time of the incident. He allowed his nephew's age was "somewhere around there" but acknowledged he could not remember. Appellant denied there were any acts of penetration. He also denied there were other incidents of sexual contact with his nephew or other minors.

Referring to Appellant's nieces, the agent asked, "Did you do that with the girls as well?" Appellant replied in the negative and, during subsequent questioning, again denied sexual contact with a minor other than his nephew:

> Q [FBI Agent]: Was there another time where you might have touched some girls at--with other family members?
>
> A [Appellant]: No, nobody, ever.
>
> Q: Okay, all right. So what other incidents happened with either your nephew or other males then?
>
> A: Incidents?
>
> Q: What other times were you in sexual contact with minors?
>
> A: Oh, that was it. With him, that was it.

A short time later, the FBI agent manifested a belief that "it's really never just one time, it's never just once." He continued: "And the reason is because . . . whatever it is that elicits that neurochemical response in your brain when you fondled your nephew is always there." The agent remarked to Appellant, "[Y]ou need to get it all out. And that is the best thing for you from a practical,

as well as a spiritual perspective, all right[?]" He asked Appellant, "So, what else happened? What else are you concerned about, do you regret, that you want to get out right now today?" He told Appellant, "your brain or your heart, one of the two is going to recognize that [ ] complete honesty is what is in your best interest."

In time, Appellant admitted fondling his niece. He stated that it happened the same night, after he fondled his nephew, and in the same way. In Appellant's telling,

> A [Appellant]: [I k]ind of did it to my niece too, but not as much. It was one time and that was it.
>
> Q [FBI Agent]: Okay, okay. And how old was your niece?
>
> A: She's two years younger than [the nephew]. This was the same time where we were all sleeping there.
>
> Q: Okay.
>
> A: But I didn't--just like the same, I didn't penetrate or whatever [sic] anything. It was just more fondling and feeling.
>
> Q: Okay, okay. So, you were fondling her vagina?
>
> A: Mm-hm.
>
> Q: Okay, all right.
>
> A: And that was it, that was it.

Like his nephew, Appellant acknowledged his niece had been sleeping on the living room floor. He offered that her vagina "was a little moist." Appellant clarified that "[h]er panties were wet," and his hand did not go inside her underwear. After the touching, his niece "went to the restroom," but "she didn't see or notice anything" he had done. Appellant volunteered he "didn't fondle much with her," and that "when she woke up everything was done and [Appellant] went to sleep too."

Without prompting, Appellant said he fondled his nephew on a second occasion under "the same" circumstances as the first. As Appellant described it, the second incident happened during a subsequent trip Appellant and his wife took to visit with her family, but this second incident only involved his nephew. Like before, Appellant, his nephew, and his nieces were lying on the floor one night. On this second occasion, Appellant acknowledged he again touched his nephew's erect penis as his nephew slept on the floor. Later in the interview, the agent asked, "And what about you during that time? Were you masturbating as well during that or just kind of fondling him?" Appellant answered, "No, it was just watching, just like if I was watching a movie." Afterward, according

43

to Appellant, he either fell asleep on the floor or went to sleep in a bedroom where his wife was sleeping.

The FBI agent probed Appellant to provide details when both incidents happened. Appellant was more certain about the timeframe for the first incident than the second, and his answers suggested he had difficulty remembering details of the timing. He said the first incident involving his nephew and niece occurred in January or February 2011 after he returned to Dyess AFB, Texas, from an overseas deployment. Appellant was less certain when the second incident happened, only that it was during a subsequent visit with his wife's family. Initially, he recalled the second incident "[h]ad to be before [his nephew and niece] went back to school in the . . . summer of 2011."

Reflecting again on the timeframe of the first incident, Appellant told the agent that this would place the first visit to his wife's family in Missouri in the timeframe of January or February 2011, when he and his wife "visited them during [his] R and R," affirming, again, "that's [ ] the first time it happened." However, Appellant immediately corrected himself about the timeframe for the second incident with just his nephew, explaining it happened when he and his wife "visited them again . . . in 2012[,] I think, I can't remember." Appellant reiterated, "Yeah, it had to be the next year," in 2012 when he had fondled his nephew on a second occasion. Later in the interview, Appellant stated with certainty that he and his wife "came back the next year for [sic] summer for a visit before they went back to school," which placed the second incident in 2012.

Upon further questioning, Appellant acknowledged that the sexual conduct with his niece and nephew occurred within a timeframe of 2011 to 2012. Near the conclusion of the interview, Appellant again acknowledged sexual contact occurred in the 2011–2012 timeframe:

Q [FBI agent]: Okay, all right. So, just so I'm clear, 2011, one night.

A [Appellant]: Mm-hm.

Q: You fondled your nephew.

A: And niece.

Q: And niece. He had an erection but didn't ejaculate.

A: Correct.

Q: She became wet through her panties, right.

A: Through her panties.

Q: Through fondling. She wakes up, goes to the bathroom and comes back, and you don't touch either of them again that night, or anybody else----

A: That year, nobody else.

Q: Okay. And then the second time is when you came back in 2012.

A: Mm-hm.

Q: Okay. And so, your nephew would have been how old in 2012?

A: He's 19 now, 18, 5 years difference so 13.

Q: Okay, so 13. And how old is your niece?

A: She's two years younger.

Q: Okay, so 11. So, 13 and 11. And you fondled both of them in 2012 or just----

A: One, just the boy.

Q: Just the boy, okay.

A: Just the boy.

### iii) Interview Conclusion

Near the end of the post-polygraph interview, Appellant again explained how he fondled his nephew and niece. In the presence of a second agent, Appellant provided a narrative of the first time he touched his nephew in a sexual manner, which was generally consistent with his earlier statements with one notable exception. Appellant now placed the first incident when he said he fondled his nephew and niece in *summer* 2011, and not January or February 2011 as he stated earlier. However, neither Appellant nor the FBI agent acknowledged that difference. In Appellant's telling, he returned from an overseas deployment in January or February 2011 and

> later on *that summer* we ended up going to visit [my wife's] family up in Missouri where my nieces--or nieces and nephew were there. And one of those nights we were watching movies. I can't remember what movie, but I'm pretty sure it was like action or a cartoon movie. We all dozed off. I woke up in the middle of the night and everybody was sleeping in the rooms with the exception of me, my nephew, and two nieces who were watching a movie. And then when I woke up, I don't know what got to me, but it was more of a fondling thing. [I e]nded up fondling him. I don't know where it came from. I guess the curiosity since I was just there. And then all I did was pretty much touching. . . .[I]t was just my hands touching . . . his penis, to arouse him with an erection.

(Emphasis added).

Appellant then described sexual contact with his niece, again placing the timeframe in *summer* 2011, and not January or February 2011 as he stated earlier:

> And then I waited a little bit, I couldn't fall asleep, and I moved over to my niece who was there, the older one. And I just pretty much had my hands on her underwear until she got a little bit moist and that was it. She ended up waking up and went to the restroom, so I went to sleep. I fe[l]l asleep back on the floor. [I w]oke up in the morning and everybody was still in the same arrangement. We were all sleeping on the floor in the living room. So that was that incident in the summer of 2011.

Appellant summarized a second incident of sexual contact with just his nephew in summer 2012, following the incident in the previous summer:

> After the summer, I guess because of the--I don't know, my wife and I, we were having a rough time, we were trying to get things back after she found out that I [knew] she was having an affair. But then throughout that year everything was okay until we visited them again [the] next summer. It was okay until another night we ended up watching in the living room again, and it happened just to my nephew where I did practically exactly the same thing.

### 2. Applicable Standard of Review

A Court of Criminal Appeals "may affirm only such findings of guilty" as it "finds correct in law and fact and determines, on the basis of the entire record, should be approved." Article 66(d)(1), UCMJ, 10 U.S.C. § 866. We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States*

*v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). To reach a determination of legal sufficiency, there must be some competent evidence in the record from which the trier of fact was entitled to find beyond a reasonable doubt, the existence of every element of the offense charged. *United States v. Wilson*, 6 M.J. 214, 215 (C.M.A. 1979).

An examination for legal sufficiency "involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (internal quotation marks and citation omitted). "In determining whether *any* rational trier of fact could have determined that the evidence at trial established guilt beyond a reasonable doubt, [this court is] mindful that the term 'reasonable doubt' does not mean that the evidence must be free from any conflict or that the trier of fact may not draw reasonable inferences from the evidence presented." *Id.* (citation omitted). The Government can meet its burden of proof with circumstantial evidence. *Id.* (citations omitted). When examining the evidence in the light most favorable to the prosecution, "a rational factfinder[ ] could use his 'experience with people and events in weighing the probabilities' to infer beyond a reasonable doubt" that an element was proven. *United States v. Long*, 81 M.J. 362, 369 (C.A.A.F. 2021) (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399).

### 3. Elements of the Charged Offenses

Appellant was found guilty of committing aggravated sexual abuse of his nephew who had not attained 16 years of age in violation of Article 120(f), UCMJ, 10 U.S.C. § 920(f) (2008 *MCM*). For Appellant to be found guilty of this offense, as charged, the Prosecution was required to prove two elements beyond a reasonable doubt: (1) that, on divers occasions between on or about 28 January 2011 and 27 June 2012, Appellant engaged in a lewd act, to wit: touching with his hand, the penis of his nephew; and (2) that the act was committed with a child who had not attained the age of 16 years. *See* 2008 *MCM*, pt. IV, ¶ 45.b.(6). With regard to "lewd act," the statute explains this term "means . . . the intentional touching, not through the clothing, of the genitalia of another

person, with an intent to abuse, humiliate, or degrade any person, or to arouse or gratify the sexual desire of any person." 2008 *MCM*, pt. IV, ¶ 45.a.(t)(10)(A).

Appellant was also found guilty of committing aggravated sexual contact upon his niece who had not attained 12 years of age in violation of Article 120(g), UCMJ, 10 U.S.C. § 920(g) (2008 *MCM*). For Appellant to be found guilty of this offense, as charged, the Prosecution was required to prove two elements beyond a reasonable doubt: (1) that between on or about 28 January 2011 and 27 June 2012, Appellant engaged in sexual contact with a child by touching the vulva of his niece through the clothing with his hand; and (2) that at the time of the sexual contact his niece had not attained the age of 12 years. *See* 2008 *MCM*, pt. IV, ¶ 45.b.(7)(a). The statute explains that the term "sexual contact" "means the intentional touching, either directly or through the clothing, of the genitalia . . . of another person . . . with an intent to abuse, humiliate, or degrade any person or to arouse or gratify the sexual desire of any person." 2008 *MCM*, pt. IV, ¶ 45.a.(t)(2).[22]

### 4. Analysis

Appellant argues that his two convictions, founded on his admissions to touching his nephew and niece in a sexual manner, are legally and factually insufficient. Appellant asks the court to find his admissions unreliable and untrustworthy as a matter of law and fact.

Evidence presented at trial supports the legal sufficiency of both convictions. A rational trier of fact could conclude that Appellant, on two occasions, used his hand to directly touch his nephew's penis before his nephew attained the age of 16 years. On the issue whether Appellant's admissions showed that he touched his nephew's penis directly, and not through the pajamas his nephew was wearing, Appellant admitted in the post-polygraph interview that "it was just [Appellant's] hands touching . . . his [nephew's] penis, to arouse him with an erection." Appellant also answered affirmatively when asked if he had pulled down his nephew's pajamas before engaging in the conduct at issue. A rational trier of fact could also conclude that Appellant used his hand to touch the vulva of his niece through her clothing before she attained the age of

---

[22] The statute further explains in a prosecution under Article 120(g), UCMJ, it need not be proven an accused knew the child had not attained the age of 12 years, 2008 *MCM*, pt. IV, ¶ 45.a.(o)(1), and "[i]t is not an affirmative defense that [an accused] reasonably believed that the child had attained the age of 12 years," *id.*; *see also* 2008 *MCM*, pt. IV, ¶ 45.a.(r). Thus, unlike a prosecution for aggravated sexual abuse of a child under Article 120(f), UCMJ, it is not an affirmative defense in a prosecution under Article 120(g), UCMJ, that an accused reasonably believed the child had attained a certain age.

12 years. Evidence showed, moreover, that Appellant engaged in the charged conduct with intent to arouse the children and gratify his own sexual desire.

As noted, the Government charged Appellant with committing offenses against his nephew and niece "between on or about 28 January 2011 and 27 June 2012," and in the alternative, "between 28 June 2012 and on or about 27 August 2013."[23] Appellant was convicted of acts during the former timeframe and acquitted of the same conduct that was charged during the latter. Appellant argues, "To the extent that there is any doubt as to the specific timing of the convicted offenses, this doubt must be resolved in [his] favor." We agree and look beyond Appellant's admissions for competent evidence on which a rational factfinder could rely to find that Appellant engaged in the charged conduct on or before 27 June 2012.

A rational trier of fact could find beyond a reasonable doubt that Appellant committed the charged acts during a timeframe that ended on 27 June 2012. Appellant admitted he fondled his nephew and niece during R and R leave he took in January or February of 2011. During this time, his wife's family lived in Texas, and they would not leave for Missouri until summer 2012 when they moved in with their grandparents. The Government notes: "Appellant made his confession in 2018, which was six or seven years after the misconduct occurred." The Government argues that "the circumstances surrounding the offense—Appellant visiting his nieces and nephew and falling asleep with them on the floor while watching movies—reportedly occurred on multiple occasions in different locations."

We agree it is understandable that after six to seven years, Appellant might have misremembered some of the details surrounding his crimes, including location and timeframe. However, such confusion does not necessarily preclude a trier of fact from finding that the acts occurred during the charged timeframe. Evidence need not be completely consistent to still be sufficiently reliable to sustain a conviction. *See, e.g.*, *United States v. McElhaney*, 50 M.J. 819, 832 (A.F. Ct. Crim. App. 1999) (concluding evidence was factually sufficient, in part, because the appellant's wife corroborated appellant's romantic relationship with victim notwithstanding wife's testimony that some of the charged acts could not have occurred), *rev'd on other grounds*, 54 M.J. 120 (C.A.A.F. 2000). Here, the most rational explanation for Appellant's inconsistencies is one he provides. In response to the FBI agent asking Appellant when he first fondled his nephew, Appellant was not only uncertain, but turned to the agent

---

[23] The Government explained on the record that the charged timeframe ends when Appellant was reassigned to an installation overseas.

and asked what he previously told the agent about his return date from an overseas deployment.

Appellant's account of the January or February 2011 timeframe for the first incidents of touching his nephew and niece is supported by a travel voucher, which marks his deployment return on 28 January 2011. Appellant admitted he fondled his nephew a second time either that summer or the next before the children returned to school. Appellant explained that this second encounter was like the first, when the three children fell asleep on the living room floor after watching movies with him. A rational trier of fact, relying on Appellant's admissions and testimony from his wife's family, could find beyond a reasonable doubt that Appellant touched his nephew a second time in summer 2011. The family members' testimony shows that Appellant had regular access to his niece and nephew before the summer of 2012 and supports Appellant's account that he often spent the night with his nephew and nieces in the living room after watching movies.

Appellant also challenges both the reliability of his admissions to the FBI and the weight that should be given to evidence introduced as corroboration. As to this first contention, Appellant characterizes his admissions as a "false confession" brought about from nine hours of custodial interrogation.[24] He argues, moreover, those admissions are unreliable because they are insufficiently specific as to a timeframe when the charged conduct supposedly occurred. As to his second contention, Appellant argues the evidence is insufficient because the named victims denied any memory of the charged acts, and because the FBI agents found no independent evidence of Appellant's sexual involvement with his nephew or niece—or other children for that matter.

---

[24] Appellant argues the Government's proof is insufficient because his admissions were

> obtained after hours of intense and relentless FBI interrogation techniques being imposed upon him, beginning with [Appellant]'s forceful removal from his home before sunrise by fully armed agents who rammed down his door with weapons drawn, followed by hours of custodial questioning in a police car as the agents searched his home, and ultimately being subjected to a polygraph examination, before finally being repeatedly asked to confess to offenses of which there was no independent evidence.

To the extent Appellant claims the evidence is legally insufficient because his admissions were involuntary, we assess the totality of the surrounding circumstances and find the voluntariness of those admissions was demonstrated by a preponderance of the evidence and they were properly admissible at trial. *See United States v. Bubonics*, 45 M.J. 93, 94–96 (C.A.A.F. 1996). We also examined those circumstances as they bear on legal and factual sufficiency of the convictions at issue.

We have considered these contentions, which repeat many of Appellant's assertions at trial. Our review of the *legal* sufficiency of the convictions requires an examination of whether any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. *Jackson*, 443 U.S. at 318–19; *Robinson*, 77 M.J. at 297–98. Our determination includes evaluating all reasonable inferences from the evidence in favor of the Prosecution. *Barner*, 56 M.J. at 134 (C.A.A.F. 2001). Just as "factfinders may believe one part of a witness' testimony and disbelieve another," *United States v. Harris*, 8 M.J. 52, 59 (C.M.A. 1979), the trier of fact here might accept parts of Appellant's admissions and reject others.

In our legal sufficiency review, we find no cause to challenge a determination by a rational trier of fact that Appellant's admissions to the FBI were reliable. To be sure, the FBI agent pressed Appellant to divulge incidents of sexual contact with a minor. He did so by using means that could produce unreliable admissions. However, the complete record of that questioning was before the military judge as the trier of fact, as were Appellant's answers. Appellant was unsure of the timeframe when he engaged in the charged acts, but we cannot say that, as a matter of law, Appellant's admissions were unreliable as they bear on the elements of the charged offenses.

Turning to evidence of corroboration, a factfinder may consider "[t]he amount and type of [such] evidence . . . in determining the weight, if any, to be given to the admission or confession." Mil. R. Evid. 304(c)(4); *see also United States v. Duvall*, 47 M.J. 189, 192 (C.A.A.F. 1997) (observing "the nature of any corroborating evidence is an appropriate matter for the members to consider when weighing the statement before them"). A rational trier of fact could find support for the trustworthiness of Appellant's admissions from independent evidence of Appellant's leave records, the general timeline Appellant gave for visits with his wife's family, and that he stayed up late watching movies in the living room with his nephew and nieces until they fell asleep. Evidence of the children's ages also supports Appellant's admissions. A rational trier of fact could give some weight to these factors, find sufficient evidence of corroboration, and infer that Appellant had the requisite intent for both offenses. Viewing the evidence in the light most favorable to the Prosecution, *see Robinson*, 77 M.J. at 297–98, a rational factfinder could find beyond a reasonable doubt each element of the offenses Appellant committed upon his nephew and niece.

We then ask whether the evidence, although legally sufficient to support the convictions, leaves us convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. While the court has the independent authority and responsibility to weigh the credibility of the witnesses in determining factual sufficiency, we recognize that the trial court saw and heard the testimony. *See United States v. Moss*, 63 M.J. 233, 239 (C.A.A.F. 2006) (stating it is

the members' role to determine whether testimony is credible or biased). The court also recognizes that we, like the factfinder at trial, have a responsibility to weigh the probability that Appellant's admissions are reliable, sufficiently corroborated by independent evidence, and that he acted with requisite intent. *Long*, 81 M.J. at 369 (observing appellate court may consider in its *legal* sufficiency review that a rational factfinder could weigh probabilities to infer that an element was proven beyond a reasonable doubt).

Although the evidence could support an inference that Appellant felt pressured to make statements against his self-interest, we are not inclined to find the admissions he made were untrue, much less involuntary, based on coercion. Appellant's personal circumstances suggest that his statements to the FBI tend to be reliable. His age, education, military grade of E-7, length and type of military service, and scope of responsibility that he exercised in his military duties at the time all weigh in favor of finding his statements were neither erroneous nor coerced. Before answering questions, more than once Appellant was advised of and waived his *Miranda* rights and was informed that he could stop questioning at any time. He also consented to FBI agents assuming and using his online identity.

Because each of these decisions was meaningful, they indicate to us that Appellant understood he was making intelligent waivers of important rights that were against self-interest. Appellant was initially handcuffed in a government car as FBI agents searched his home, but he was not handcuffed when he made admissions in the post-polygraph interview. In our review of the video of that interview and its transcription, Appellant's demeanor was calm, and he appeared comfortable.[25] There is no reason to believe Appellant's statements were the product of hardships or unmet personal needs before or during that interview.

Appellant rejected the FBI agent's suggestion about the likely settings and provocation for him having had sexual contact with a minor. The agent repeatedly offered that Appellant's indiscretion with a minor was likely a "consensual" situation, and possibly during a "time where [Appellant] w[as] feeling betrayed" by his wife's infidelity. At one point the agent suggested it might have occurred in a foreign country. Even so, Appellant corrected the agent,

---

[25] As far as this court's findings regarding Appellant's interviews, we note that "[u]nlike most intermediate appellate courts and [the CAAF], the Court of Criminal Appeals has factfinding powers." *United States v. Cendejas*, 62 M.J. 334, 342 (C.A.A.F. 2006) (citing Article 66(c), UCMJ, 10 U.S.C. § 866(c) (2000)).

divulging that "it wasn't in this timeframe[—t]his timeframe since the incident that I told you about my wife['s]" adultery. Rather, in Appellant's telling, "we were visiting family," which was a setting the agent had not previously suggested as a possibility. After that, Appellant admitted fondling his nephew in a narrative confession in which Appellant again contradicted the agent, revealing for the first time, "I'm going to say it doesn't seem consensual because [his nephew] was sleeping." It was then that Appellant revealed for the first time, "It was my nephew on my wife's side."

Under these circumstances, we disagree with Appellant's claim that the length of the interrogation and the manner by which the FBI agent conducted the interview with Appellant unlawfully coerced his admissions. We also find that Appellant's emotional response when an FBI agent asked if he had ever touched a child in a sexual manner contributes to the sufficiency of the convictions. In this regard, Appellant's consciousness of guilt is some evidence he, in fact, inappropriately touched his nephew and niece in the manner charged by the Government. Having weighed the evidence in the record and made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. Accordingly, Appellant's convictions are not just legally sufficient, but factually sufficient as well.

## D. Trial Counsel's Findings Argument

Appellant contends that trial counsel improperly argued in findings that Appellant could have engaged in instances of sexual contact with children beyond the acts he admitted in the post-polygraph interview with the FBI. In Appellant's telling, trial counsel argued that Appellant's admissions to sexually abusing his nephew and niece were "just the tip of the iceberg," in the same way that Appellant underestimated the amount of child pornography in his possession during his first interview with the FBI. We have reviewed trial counsel's argument in context and find Appellant's contention is not supported by the record. Accordingly, we are not convinced trial counsel's argument was improper for arguing facts not in evidence, as characterized by Appellant.

### 1. Additional Background

The statements of trial counsel at issue comprised a small portion of the findings argument. Near the end of argument, trial counsel reasoned that Appellant may have been mistaken about the locations and timeframe during which he fondled his nephew and niece. Trial counsel maintained that Appellant "has a hard time talking about exact timeframes and years" and then drew a parallel with Appellant minimizing his involvement with child pornography during his first FBI interview. Without objection, trial counsel began this portion of the argument at issue by giving an example of Appellant "contradicting himself" in the post-polygraph interview:

We see him saying, ["]I know it happened in the winter of 2011 after I got back from a deployment,["] and later saying, ["]well maybe it was actually the summer of 2011.["] So we know . . . his own memory of exactly the timeframe of these things is not perfect.

But we also see too in [Appellant's first] interview [with the FBI agent], his minimization of his involvement with the child pornography, that the [forensic] analysis showed what [Appellant]'s talking about in the car with that FBI agent *is really just the tip of the iceberg.*

*And similarly that could be happening here* where these instances occurred maybe one in Texas, one in Missouri, but it's easier to say, yes, it was both Missouri. But there's enough there to show that what he's talking about is credible.

(Emphasis added).

Next, trial counsel argued at length how the evidence showed dates and locations when Appellant had opportunities to commit the charged offenses that were consistent with his admissions to the FBI.

### 2. Law

Claims of prosecutorial misconduct and improper argument are reviewed de novo. *United States v. Marsh*, 70 M.J. 101, 104 (C.A.A.F. 2011) (citation omitted). "We review prosecutorial misconduct and improper argument de novo and where . . . no objection is made, we review for plain error." *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citation omitted). Plain error occurs when "(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right." *United States v. Erickson*, 65 M.J. 221, 223 (C.A.A.F. 2007) (internal quotations and citations omitted). "As all three prongs must be satisfied in order to find plain error, the failure to establish any one of the prongs is fatal to a plain error claim." *United States v. Bungert*, 62 M.J. 346, 348 (C.A.A.F. 2006).

Not every improper comment by the Prosecution is a constitutional violation. *United States v. Webb*, 38 M.J. 62, 65 (C.M.A. 1993) (citation omitted). Instead, we evaluate the comment in the context of the overall record and the facts of the case. *Id* at 65–66; *see also United States v. Baer*, 53 M.J. 235, 238 (C.A.A.F. 2000) (observing that "the argument by a trial counsel must be viewed within the context of the entire court-martial"). In determining prejudice, we consider "whether there was 'a reasonable probability that, but for the error, the outcome of the proceeding would have been different.'" *Voorhees*, 79 M.J. at 9 (quoting *United States v. Lopez*, 76 M.J. 151, 154 (C.A.A.F. 2017)).

### 3. Analysis

Appellant urges the court to find that trial counsel committed prosecutorial misconduct by arguing that Appellant may have committed additional child sexual assault offenses than what could be fairly inferred from the record. Citing the CAAF opinion in *United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016), Appellant claims there is no way to be certain that Appellant's convictions for the offenses he committed against his nephew and niece were based upon the evidence adduced at trial, on the one hand, or on trial counsel's suggestion of Appellant's propensity to commit such offenses, on the other. Appellant claims trial counsel improperly used evidence underlying the child pornography offenses to show propensity to engage in the conduct against his nephew and niece.

As background, the record reveals that Appellant appeared to minimize his involvement in child pornography. Appellant seemed hesitant to reveal details, to include the number of images he possessed and retained, which forensic analysis later revealed was many thousands of pictures and videos. In our reading of the remarks that precede and follow trial counsel's "tip of the iceberg" comment, and "that could be happening here" argument, we are not convinced of Appellant's contention that trial counsel was arguing propensity. *See Baer*, 53 M.J. at 238 (observing "it is improper to 'surgically carve' out a portion of the argument with no regard to its context"). In context, trial counsel did not plainly imply Appellant committed sexual abuse of other children. Instead, she suggested Appellant had not been completely forthcoming about his involvement with child pornography, so similarly, he may have not been completely accurate about the location, timeline, or extent of his confessed instances of fondling his nephew and niece.

Completing trial counsel's analogy, the "tip of the iceberg" was that Appellant revealed much less than he was willing to disclose or able to remember about the location and timeframe when he fondled his nephew and niece, to include when both families lived in Texas. This inference was reasonable and not plainly improper. Appellant has not demonstrated trial counsel committed prosecutorial misconduct.

### E. Delayed Appellate Review

Appellant's case was docketed with the court on 3 March 2021, more than 18 months before a decision was rendered. In *United States v. Moreno*, our superior court established a presumption of facially unreasonable delay when a service Court of Criminal Appeals does not issue a decision within 18 months of docketing. 63 M.J. 129, 142 (C.A.A.F. 2006).

Because there is a facially unreasonable delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): (1) the length of the

delay; (2) the reasons for the delay; (3) an appellant's assertion of his right to a timely review; and (4) prejudice to the appellant. *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *United States v. Toohey*, 60 M.J. 100, 102 (C.A.A.F. 2004)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

As to the first factor—the length of the delay—the appellate review of Appellant's case has exceeded the *Moreno* standard of 18 months by less than three months. Accordingly, this factor weighs in Appellant's favor, but only slightly. As to the second factor—the reasons for the delay—Appellant filed his assignments of error on 28 November 2021, almost nine months after his case was docketed with this court, and after securing six enlargements of time. The Government filed its answer on 7 January 2022, at which point the case was joined. Appellant replied to the Government's answer on 14 January 2022. Under these circumstances, we find the reasons for delay weigh moderately against a finding of a due process violation. As to the third factor, Appellant has not asserted his right to timely review. Accordingly, this factor weighs against Appellant.

Turning to the fourth factor—prejudice—we note *Moreno* identified three types of prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. 63 M.J. at 138–39 (citation omitted). Where, as here, an appellant does not prevail on the substantive grounds of his appeal, there is no oppressive incarceration. *Id.* at 139 (citation omitted). Similarly, where an appellant's substantive appeal against his conviction fails, his ability to present a defense at a rehearing is not impaired. *See id.* at 140–41. Furthermore, we do not discern any "particularized anxiety or concern that is distinguishable from the normal anxiety experienced" by an appellant awaiting an appellate decision. *See id.* at 140. Accordingly, this factor weighs against Appellant. *See Toohey*, 63 M.J. at 361. Considering all the factors together we do not find a violation of Appellant's due process right owing to delayed appellate review.

In the absence of a due process violation, a Court of Criminal Appeals has authority under Article 66, UCMJ, "to grant relief for excessive post-trial delay without a showing of 'actual prejudice' within the meaning of Article 59(a), [UCMJ,] if it deems relief appropriate under the circumstances." *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002) (citation omitted). To determine if

*Tardif* relief is warranted, we consider the factors announced in *United States v. Gay*, 74 M.J. 736 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016). Those factors include how long the delay exceeded standards, the reasons for the delay, whether the Government acted with bad faith or gross indifference, evidence of institutional neglect, harm to the appellant or to the institution, whether relief is consistent with the goals of both justice and good order and discipline, and whether this court can provide meaningful relief. *Id.* at 744. Applying these factors, the court finds appellate delay justified and relief is not warranted.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to a substantial right of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court